Filed 7/31/18

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JAIME G., | B280569 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BF057099) |
| v. | |
| H.L., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Dean Hansell, Judge. Reversed and remanded.

Los Angeles Center for Law & Justice, Carmen McDonald, Sarah Reisman, Melissa Viramontes; Gibson, Dunn & Crutcher, Kahn A. Scolnick, Michael Holecek and Colby A. Davis for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

————————————

A mother appeals from a child custody order. The family court ruled Father was a domestic abuser but then awarded child custody jointly to Father and Mother, with Father getting most of the visitation time. A statute applies to this situation. The Legislature passed this statute to move courts to give heavier weight to the existence of domestic violence. The statute requires family courts to make specific findings, in writing or on the record, about seven factors, including whether the perpetrator has successfully completed a batterer's treatment program. The trial court was in the midst of stating its reasons on the record when the conduct of counsel terminated the hearing. Courts possess full authority to maintain orderly control of hearings. When oral statements on the record cannot be completed, however, the statute requires the trial court to "state its reasons in writing . . . ." (Family Code Section 3011, subd, (e)(1).) (All statutory citations are to the Family Code.) We reverse and remand for the family court to hold a new hearing that complies with this statutory requirement about specific findings on each of the seven statutory factors.

# FACTUAL AND PROCEDURAL BACKGROUND

This child custody dispute over seven-year-old Matthew was between biological parents H.L. and Jaime G. There were three substantial court hearings.

A. *The First Hearing*

The first substantial hearing was on September 19, 2016. As a self-represented litigant, Father petitioned to establish a parental relationship. Neither Mother nor Father had a lawyer at this hearing.

The court methodically proceeded through a comprehensive agenda. It first established parentage and jurisdiction. It queried the parents about living and working arrangements. Father lived in a house, sleeping in a bunk bed in a room with four others. Father and Matthew were in the top bed, while Father's partner Clara slept below with her two children. Father had lived there for a year. He paid $500 in monthly rent and worked full time in shipping. Matthew attended an elementary school a 10-minute walk away. Father took Matthew to school and picked him up every day.

The court asked Mother for similar information. She lived in a house with others; she was unsure who owned it. Mother shared her bedroom with her boyfriend.

3

Mother and Father lived about 45 minutes apart. Father owned a car. Mother did not.

Mother had three children besides Matthew, ages nine, 10, and 12. They were in Guatemala. Mother last saw her other children in 2007.

The court tried to establish Mother's employment situation. Mother was unemployed and claimed that, "due to the court appearances, I was laid off." After Mother said she was not working "because of this court proceedings," the court asked when she was last in court. Mother replied "I've never been. This is the first time." The court, evidently puzzled by the contradiction, repeated the question. The court asked when Mother had last been to "any court," and again Mother replied, "[n]o other time."

The court asked how long Mother had lived at her current address. Mother said nearly three months. Before that, Mother reported living at a different address for two years, and before that for six months at a third address. Before the third address, she had lived at a fourth address for "like a year."

The court asked Mother why she had not seen Matthew for three months. Mother said she called about Matthew, but Father told her Matthew did not want to speak with her. Then one day Father "told me to come because the child was sick and when I arrived he gave me court documents and he pushed me, almost

4

knocked me down.  I was scratched up.  And at that time I also called the police."

The court asked Father why he had not allowed Mother to see Matthew.  Father's responses were contrary to Mother's: Father said, "She hasn't called me at all."  Father said he learned Mother was high on drugs and had abandoned Matthew with a babysitter for three days, and so he went to Long Beach to get Matthew.  Father said Mother would abandon Matthew while Mother and her boyfriend went in a car to smoke weed.  Further, Mother would "go into the bathroom with a pipe all night."

The court asked Mother if she smoked marijuana in the house when Matthew was present.  Mother denied smoking marijuana and then said, "When I was young, yes, many years ago I smoked marijuana."

The court examined school documents showing Matthew's school attendance was good when Matthew was with Father.  When Matthew was with Mother, however, the court found Matthew experienced "quite a high absence rate" at school.

The court said that its concern was with the best interest of the child, and that Matthew should have regular and continuous contact with both parents.  "Matthew is only seven.  He is not going to be an adult for 11 more years.  That's a long time.  And it will be critical for you both to get along with each other to co-

parent as much as you can with each other in order to make sure that Matthew has a good education."

The court then ordered legal custody ("that is who has responsibility for making decisions about Matthew's well-being, his education, his health and so forth") would be joint: shared equally between Mother and Father. The court ordered physical custody as follows. Matthew would remain with Father during the school week, but the court stated Mother must get regular access to Matthew. The situation was complicated because only Father had a car, and the parents lived 45 minutes apart. Most visitation thus would have to be on weekends because Matthew was in school during the week. The court gave Mother Saturday and Sunday visitation, with Father ordered to provide transportation. As for school holidays and other holidays, the court gave Mother more access to compensate for Father's primary physical custody. The court ordered alternating weeks of custody during Matthew's summer vacation.

Following this hearing, Mother retained counsel, but Father did not.

B.      *The Second Hearing and Following Events*

The second hearing was on November 9, 2016. Father again represented himself. Mother now had a lawyer, who objected she had not received service of a declaration Father was

6

presenting to the court. The court continued the hearing to permit Mother to examine and to respond to Father's declaration.

This November hearing itself was not substantial, but there were three written filings before and after it: Mother's request for a domestic violence restraining order, Father's response to Mother's request, and Mother's counsel reply to Father's declaration.

These three documents detailed Mother and Father's relationship with their son Matthew. In these filings, the parents continued to present sharply conflicting accounts, as follows.

In her request for a domestic violence restraining order, Mother described her injuries as "lost my balance, scrape on my chest."

In the attached declaration, Mother stated "I need a restraining order against [Father] because [Father] continues to berate me in front of our son, has scratched me across my chest, forcefully pushed me, physically removed our son from my home without returning him, has threatened me on multiple occasions to take our son to Guatemala."

Mother's declaration recounted meeting Father in Guatemala in 2002. They lived together from then until 2011. Mother wrote the two separated "due to [Father's] violent behavior towards me."

7

Mother wrote the most recent incident of Father's abuse was on October 1, 2016, when Father drove erratically towards Mother and Matthew. Father berated Mother in front of Matthew. Mother repeated her charge that, on August 6, 2016, Father pushed her and scratched her chest. Mother claimed Father had a history of abusing her.

Father responded to Mother's filing on November 2, 2016. Father swore all of Mother's allegations against him were "lies." Father wrote he wanted sole custody of Matthew because Mother was using crystal methamphetamine. Mother told Father she was going to start treatment for her drug problem. Mother's babysitter called Father to say that Mother left Matthew with the babysitter for three days, that Mother was high on drugs then, and that Mother is "really high all the time." Father met with Mother and told her, "you are going down the wrong path, you're high right now, we will talk when you are better. [Mother] stays quiet and I leave."

Father denied trying to run Mother over, and denied hitting or pushing Mother. Father said Mother hit and scratched him. He wrote that on August 7, 2016 Mother called police, who first handcuffed Father but then released him without arrest after interviewing both parents. Father claimed police told Mother to stay away from the general area of Father's house.

The police gave Father a business card with the officers' names and instructed Father to call if Mother returned.

Father claimed the relationship with Mother ended in 2011 because she was with another man. Father claimed Mother never sent money or called the couple's three children in Guatemala, and Mother told people in the United States she has only one child: Matthew.

Father's declaration claimed Mother became mentally unstable when high on drugs. Father described an episode where Mother left the house with Matthew in the car because Mother "was afraid that helicopters and police were searching for her and her friends." Father ascribed this episode to Mother's use of methamphetamine.

Father submitted pictures of clothes and a book bag he bought for Matthew, as well as a photo of "some meth that is [Mother's]." The photos include pictures of a young boy smiling and showing off clothes and a book bag. Father also attached a photo of Mother drinking a beer, as well as the "business card from the police officer who arrived at the altercation on 8/7/16." Father submitted a Los Angeles Police Department business card listing two officers' names. The back of the police card contains this writing: "ADV. TO COMPLETE CUSTODY PROCESS OVER CHILD IN COMMON."

On November 22, 2016, Mother's counsel filed a reply to Father's declaration. This brief alleged Father was not complying with court orders because he was consistently late and sometimes did not drop Matthew off for visits at all. Mother denied using crystal methamphetamine and denied Father helped Mother with rent or food. Mother blamed Father for Matthew's school absences, saying Father failed to drop Matthew off on Monday mornings. "It was difficult for me to take our son to school on a couple of occasions when I did not have a car as well." Mother attached documents she claimed supported her side of the story.

## C.   *The Third Hearing*

The third hearing was on December 2, 2016. The court showed conscientious familiarity with the parties' filings by summarizing their written contentions. Mother then testified orally, describing how, when she tried to take Matthew with her, Father tried to get Matthew away from her. Father "pushed me and tried to knock me down to the floor, and he scratched me on my neck." Mother called police, who came to the scene but did not arrest Father. Mother described a threat Father made to her, and her lawyer asked Mother whether she believed Father's threat. Mother said that, "[h]onestly, I didn't take it very seriously." Counsel asked Mother if she thought Father would

continue to abuse her without a restraining order. Mother said "[m]aybe not physically but verbally. Yes. And psychologically."

The court then heard from Father, who denied Mother's charges of abuse and said Mother was lying. Father explained Mother was not getting Matthew appropriate medical care. Father had to take Matthew to a medical clinic because Mother repeatedly texted Father she would do it but she failed to follow through. After Father took Matthew to the clinic, Mother lacked interest in Matthew's medical condition.

The court granted the request for the domestic violence restraining order, with modifications, setting the term at 24 months.

Mother's counsel cited the above-mentioned section 3044, noting it creates a presumption Mother should have sole custody of Matthew. The court agreed this presumption applied and it awarded sole physical and legal custody to Mother. The trial court also ruled Father was to have visitation rights as set forth in the court's September 19, 2016 order. This order gave most of the visitation time to Father.

Mother's counsel requested child support. After some discussion, Mother's counsel asked to continue the child support issue to a future date. The court agreed.

The parties then engaged over the terms of Father's visitation. Mother's counsel again cited section 3044. The trial

11

judge remarked the September 19th hearing had been extensive and none of the evidence in the current hearing had changed what would be in Matthew's best interest.

Following this hearing, there were more filings.

On December 11, 2016, Mother's counsel filed a motion for reconsideration of the court's order. Father responded the next day, filing a new declaration denying Mother's claims and asserting Mother was a liar and a poor parent, with attached exhibits.

### D. *The Fourth Hearing*

The fourth hearing was on January 13, 2017. The court ruled Mother's request for reconsideration was untimely but the court reconsidered its order on the court's own motion.

In its reconsideration, the court emphasized its earlier determination "about Father's suitability to be a good father and Mother's much more limited suitability to be a good mother."

The court then tentatively modified its earlier order, but not in the way Mother requested. Instead of curtailing Father's visitation schedule, the court altered Mother's sole custody by specifying that physical and legal custody of Matthew would be joint. The court invited oral argument on its tentative ruling.

Mother's counsel again cited the section 3044 presumption. The court responded, "I will look at [section] 3044 right now."

12

The court stated its ruling that Father was more suitable and stable than Mother. The court acknowledged it issued a domestic violence restraining order but observed "the standard is not a very high standard." The court remarked it had issued the order to address "relations between Mother and Father." "And we have many situations where the parents just, you know, there are issues. There is a need to keep one parent away from the other and where they crossed over a line justifying the issuance of a DVRO [domestic violence restraining order]."

The court explained its visitation order "was based on the fact that Father is a good father to the children." "I agree with [Mother's counsel]. [Section] 3044 applies in this situation, but [section] 3044 doesn't bar visitation. . . . But you still then can go on from there and determine whether [the section 3044 presumption] can be overcome. [Section] 3044[, subdivision] (b), for example, talks about the factors . . . that one can take into consideration in overcoming a presumption with that. And here, the most important thing is to look who is the more suitable parent . . . , despite the issues in the DVRO, which this court granted, . . . [and] despite that Father remained the more appropriate parent, the better parent for the minor."

Mother's counsel then argued Father "did not rebut the [section] 3044 presumption." The court disagreed, repeating it had gone through a section 3044 analysis and that there was no

13

reason to modify the court's visitation order. Mother's counsel interrupted the court, which again repeated that it had spent time with counsel "going through [section] 3044."

The court reiterated its deliberation about who was the more suitable parent, about which home was more stable, and which person was more attentive to Matthew's educational and health care needs. The court said that Father's home was much more stable and Father was more attentive to Matthew's needs concerning education, stability, and having a safe and comfortable home. Mother's home, the court concluded, was "less stable and was not able to provide those types of things."

Mother's counsel then asked if the court had considered the Father's domestic violence in rendering its decision. The court replied, "[i]ndeed the court did consider that [factor] about the domestic violence." The court balanced that presumption against the importance of a stable and safe home for Matthew.

Mother's counsel then asked the court to "walk through the factors of . . . [section] 3044 and tell me your findings for each factor." The court agreed to do so. The court began with section 3044, subdivision (b)(1), which the court said was the primary factor in this case: the best interest of the child. Because Mother's counsel repeatedly interrupted the court, however, the court finally announced "this hearing is over because you

14

continue to interrupt." The court ended the hearing without further argument from counsel.

The court orally reiterated its ruling was based on section 3044 and that the court was "taking into account the factors in [section] 3044[, subdivision (b)]." The court concluded "the presumption that in [section] 3044[, subdivision (a)] has been overcome in this situation by Father being the far better parent to raise the child than Mother."

The trial court's January 13, 2017 minute order summarized the hearing. "The court, on its own motion, . . . modifies its order of December 2, 2016. The court awards the parties joint legal and joint physical custody of the minor child Matthew . . . . The court made its findings under . . . [section] 3044[, subdivision] (b) and discussed that it was required to consider the best interests of the minor in making custody and visitation orders. The court notes that trial is currently scheduled for February 23, 2017 at 8:30 a.m. . . . ."

In sum, after reconsidering the situation, the family court gave the parents joint custody of their son but decided to retain the visitation schedule to which Mother now objects.

# THE STATUTE:  SECTIONS 3044 AND 3011

For this appeal, two sections of the Family Code are key: sections 3044 and 3011.  The text of these sections is vital.

A.    *Section 3044:  A Rebuttable Presumption After a Domestic Violence Finding*

Subdivision (a) of section 3044 sets forth the rebuttable presumption.  Subdivision (b) lists seven factors the court "shall" consider when determining whether that presumption has been overcome.  These seven factors are the "section 3044 factors."

The relevant text of section 3044 is as follows:

"(a) Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child . . . , there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . .  This presumption may only be rebutted by a preponderance of the evidence.

"(b) In determining whether the presumption set forth in subdivision (a) has been overcome, the court shall consider all of the following factors:

16

"(1) Whether the perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child. In determining the best interest of the child, the preference for frequent and continuing contact with both parents, as set forth in subdivision (b) of Section 3020, or with the noncustodial parent, as set forth in paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part.

"(2) Whether the perpetrator has successfully completed a batterer's treatment program . . . .

"(3) Whether the perpetrator has successfully completed a program of alcohol or drug abuse counseling if the court determines that counseling is appropriate.

"(4) Whether the perpetrator has successfully completed a parenting class if the court determines the class to be appropriate.

"(5) Whether the perpetrator is on probation or parole, and whether he or she has complied with the terms and conditions of probation or parole.

"(6) Whether the perpetrator is restrained by a protective order or restraining order, and whether he or she has complied with its terms and conditions.

17

"(7) Whether the perpetrator of domestic violence has committed any further acts of domestic violence." (§ 3044, subds. (a) & (b).)

B.  *Section 3011:  A Requirement of a Written or Record Statement of Reasons*

Subdivision (e)(1) of section 3011 makes the following provision, to which we add emphasis.

"Where allegations about a parent pursuant to subdivision (b) [concerning abuse by one parent against another] . . . have been brought to the attention of the court in the current proceeding, and the court makes an order for sole or joint custody to that [allegedly abusive] parent, *the court shall state its reasons in writing or on the record. . . .*" (§ 3011, subd. (e)(1), italics added.)

## DISCUSSION

We review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the trial court's factual findings. (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 662.) On issues of statutory interpretation, however, review is de novo.

18

Mother makes three arguments on appeal.  We treat them in turn.

A.    *The Family Court Must State its Specific Reasons on the Record or in Writing*

Mother's central claim of error is that the trial court improperly applied section 3044.  To repeat, section 3044 creates a rebuttable presumption against awarding custody to a parent who has committed domestic violence.  When a trial court decides the evidence does indeed rebut this presumption, the statute requires the court to state the reasons for this decision.  This statement of reasons must be "in writing or on the record." (§ 3011, subd. (e)(1).)

This "in writing or on the record" requirement is most reasonably interpreted to require specific mention of each of the seven section 3044 factors.  (See § 3044, subd. (b)(1) - (b)(7).)

We review de novo questions of statutory construction.  In doing so, we must ascertain the intent of lawmakers so as to effectuate the statute's purpose.  (E.g., *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.)

The purpose of the rebuttable presumption statute is to move family courts, in making custody determinations, to consider properly and to give heavier weight to the existence of

19

domestic violence.  (E.g., Sen. Com. on Judiciary, Analysis of Assem. Bill 840 (1999-2000 Reg. Sess.) July 13, 1999.)

By enacting the seven factors in the rebuttable presumption statute, the Legislature created a mandatory checklist for family courts.  Mandatory checklists can improve professional decisionmaking for professionals as diverse as surgeons and pilots.  (See, e.g., Atul Gawande, *The Checklist Manifesto:  How To Get Things Right* (2009) pp. 32-47, 114-157, 175-182, 187-193.)

A reporter for the American Law Institute's family law project made this point about the need for written findings.  "The [American Law Institute's] Principles make presumptions about domestic abuse that are . . . instructive.  They require a court to assume that if a parent . . . inflicted domestic abuse . . . , limits on the first parent's access are necessary to protect the child or the other parent from harm. . . .  Written findings are required to support any allocation of custodial or decision-making responsibility to a parent, which justify allocation in light of the assumed dangers of these behaviors."  (Katherine T. Bartlett, *Preference, Presumption, Predisposition, and Common Sense: From Traditional Custody Doctrines to the American Law Institute's Family Dissolution Project* (2001) 36 Fam. L.Q. 11, 23.)

Presumptions are used in this context because courts have historically failed to take sufficiently seriously evidence of domestic abuse. (*Ibid.*)

"Without such assumptions, it has been too easy for courts to ignore evidence of domestic abuse or to assume that it will not happen again. As with the limitations on consideration of the gender of a parent or child, presumptions function to counteract the proven tendency of some courts to make judgments based on ignorance or stereotypes." (*Ibid.*)

Mandatory checklists can seem bothersome to experienced professionals but the Legislature's intent was to require family courts to give due weight to the issue of domestic violence. The requirement that courts make specific findings "in writing or on the record" furthers this legislative goal. (Cf. American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations (2002) ch. 1, topic 3, § 1.02, com. a, p. 97 ["The reason for the requirement of written findings[:] . . . Fidelity to the policies set forth in the governing law is encouraged by requiring the decisionmaker to articulate findings that explain why those policies require a result that is different from the one the rule itself would ordinarily impose. The additional requirement that the findings be written facilitates appeals grounded on those policies. . . . Not only is meaningful appellate review more likely in that case, it is also essential to

21

the creation of the body of precedent necessary for the system of rebuttable presumptions to produce consistent and predictable results.  Finally, any effort to study and evaluate the operation of a system of rebuttable presumptions is feasible only if the physical record of cases in which the decisionmaker found a governing presumption rebutted contains the findings upon which the rebuttal was based.  Such studies are necessary to determine whether the applicable rule is consistent and predictable in application, or whether amendment of the rule or its application is in order."] (ALI Principles).)

The family court in this case began stating specific findings on the record but was unable to complete that statement.  Omissions remain that raise questions.

For instance, subdivision (b)(2) of section 3044 requires courts to consider whether the domestic violence perpetrator has successfully completed a batterer's treatment program.

In this case the trial court awarded custody to Father, whom the court found was a batterer.  The court, however, imposed no batterer's treatment program on Father.  Why?  We do not know.  Sound logic may support a deliberate and thoughtful choice on this score.  Or the court simply may have overlooked the statutory suggestion of such a program.

Mother's counsel was not helpful in assisting the trial court complete this statutory obligation.  Counsel repeatedly

interrupted the court, even after the court politely asked counsel to stop interrupting. The transcript gives context.

When the court invited oral argument on its tentative ruling, Mother's counsel cited the section 3044 presumption. The court responded "I will look at [section] 3044 right now."

"The Court: . . . And based on the history since last time was not the first time that the courts have dealt with the two parents and obtained information and concluded that—

"[Mother's Counsel]: But those—

"The Court: Please don't interrupt -- that Father is a more suitable father than Mother is a suitable mother."

Mother's counsel immediately interrupted again, and the Court stated "can I ask that you not interrupt me. You've done that twice."

The court continued to state the basis for its ruling Father was more suitable and stable than Mother. The court acknowledged it had issued a domestic violence restraining order but observed "the standard is not a very high standard." The court remarked it had issued the order to address "relations between Mother and Father." The court commented its visitation order "was based on the fact that Father is a good father to the children." "I agree with [Mother's counsel]. [Section] 3044 applies in this situation, but [section] 3044 doesn't bar visitation. It simply says if you're looking at the person who . . . has

perpetrated domestic violence . . . that that person should not have a presumption of custody or visitation." "But you still then can go on from there and determine whether [the section 3044 presumption] can be overcome. [Section] 3044[, subdivision (b)], for example, talks about the factors . . . that one can take into consideration in overcoming a presumption with that. And here, the most important thing is to look who is the more suitable parent . . . , despite the issues in the DVRO, which this court granted, . . . [and] despite that [section] Father remained the more appropriate parent, the better parent for the minor."

Mother's counsel then argued Father "did not rebut the 3044 presumption." When counsel finished her argument, the trial judge attempted to respond:

"The Court: . . . [D]on't forget what I just said; that the granting of sole physical and legal custody was improvident . . . and that's why the change was . . . made. That's why I have gone through the analysis I just did based on both [section] 3044.

"[Mother's Counsel]: Your Honor, may I ask you—

"The Court: Ma'am, may I ask you.

"[Mother's Counsel]: —what your factual basis is.

"The Court: Ma'am, may I ask you again. This is now the third time I have had to ask you not to interrupt me."

The trial court stated it had gone "through [section] 3044" and that there was no reason to modify the court's visitation order.

At this point, the transcript degenerates into elliptical sentence fragments as the court and counsel speak at the same time. Ultimately the court stated "[t]his is now the fifth time I am in the middle of talking and in the middle of it, you interrupt me."

The court reiterated its deliberation about who was the more suitable parent, about which home was more stable, and which person was more attentive to Matthew's educational and health care needs. Mother's home, the court concluded, was "less stable and was not able to provide those types of things."

Mother's counsel then asked if the court had considered the Father's domestic violence in rendering its decision. The court replied, "[i]ndeed, the court did consider that [factor] about the domestic violence. . . . That is a factor that the court had to balance . . . but balance it against the importance of . . . minor child . . . having a stable, safe home, and one that would be attentive to all of the needs that the court's already articulated today."

Mother's counsel then asked the court to "walk through the factors of the . . . [section] 3044 and tell me your findings for each factor."

The court agreed to do so.

The court began with section 3044, subdivision (b)(1), which the court said was the primary factor in this case: the best interest of the child

As the court was responding to counsel's request, however, counsel again interrupted the court.

This interruption prompted the court to state "this hearing is over because you continue to interrupt." The court ended the hearing without further argument from counsel.

The trial court has many options for coping with intransigent counsel. The court can conclude oral argument and then can state its specific findings on the record. (Cf. ALI Principles, *supra*, com. b, pp. 97-98 ["The most straightforward method for complying with the requirement of written findings is an opinion or memorandum decision issued by the decisionmaker, ordinarily a judge in a judicial proceeding. That is not, however, the exclusive method for compliance. In some jurisdictions trial judges may dictate findings to a court reporter whose transcript of them is then included in the court's case file without charge to the parties, and without regard to whether a more complete transcript of the proceedings is later prepared. Such a system satisfies the requirement of written findings imposed by these Principles. It does so because it requires the decisionmaker to articulate the specific factual findings relied upon to justify

26

departure from the rule, and it produces an accessible record for study and for appellate review of whether the findings satisfy the substantive standard required for exceptions to the rule."].)

If the court opts to end the hearing before completing a record statement of the seven section 3044 factors, however, the statute requires the court's statement of reasons about these seven specific factors to be completed in writing. (See § 3011, subd. (e)(1).)

We reverse and remand for the family court to hold a new hearing and to provide this statement of specific reasons.

B.    *The Family Court Considered the Issue of Domestic Abuse*

Mother's second argument is that the trial court failed to consider the issue of domestic abuse when deciding custody. This is inaccurate. The trial court extensively considered this issue. But because we reverse and remand for a statement of reasons on the record or in writing, we leave the extent of reconsideration of this issue to the discretion of the trial court.

C.    *Mother Is Not Entitled to Sole Custody at This Time*

Mother's final argument is that this court immediately should grant her sole custody. This argument fails. On remand, the trial court shall document its analysis of this case, taking express account of the seven section 3044 factors. The trial court

27

is best situated to determine the matter of custody in the first instance.

## DISPOSITION

The order is reversed and the case is remanded to the trial court for a new hearing that complies with the statutory requirement of an express statement of reasons that specifically mentions each of the seven section 3044 factors.  Each side shall bear its own costs on appeal.

WILEY, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.