Filed 8/25/20  Marriage of Tei CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of NANCY DABU TEI and TODD SHAWN TEI. | B291304 |
| | (Los Angeles County Super. Ct. No. BD630586) |
| NANCY ALONZO DABU, | |
| Appellant, | |
| v. | |
| TODD SHAWN TEI, | |
| Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Christine W. Byrd, Judge.  Affirmed.

Nancy Alonzo Dabu, in pro. per., for Appellant.

Nicole Williams for Respondent.

The family court ordered Nancy Alonzo Dabu (formerly known as Nancy Dabu Tei) and Todd Shawn Tei to share legal

and physical custody of their daughter Anna, now seven years old.  On appeal Dabu argues the court erred by failing to find Tei had committed acts of domestic violence against her and to apply the Family Code section 3044[1] presumption that it is detrimental to the best interest of the child to award sole or joint physical or legal custody to such an individual.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Dabu and Tei's Marital History*

Dabu and Tei met in 2003 when Dabu, 13 years old, enrolled in a martial arts class taught by Tei, who was 37 years old.[2]  They became engaged when Dabu turned 18 and married the following year.  Anna was born in 2013.  Dabu and Tei separated on January 1, 2015; Anna was 18 months old.

Dabu petitioned for dissolution of the marriage on November 20, 2015.  In June 2016 Dabu and Tei stipulated on a temporary basis for joint legal and physical custody of Anna.  On November 15, 2017 judgment was entered on the issues of the status of the marriage, division of property and spousal support.  The parties reserved for trial issues of custody and visitation, child support, sanctions against Tei and Dabu's request for attorney fees.

2. *Dabu's Allegations of Domestic Abuse*

In her trial brief Dabu argued Tei was a sexual predator, contending he began molesting her when she was 15, demanding oral sex, and asserted he had intimidated, degraded and psychologically abused her throughout their relationship.  She

---

[1]     Statutory references are to this code unless otherwise stated.

[2]     The school was owned and operated by Tei.

identified in the more recent past specific instances in which Tei had allegedly stalked her and threatened to kill her and to physically harm her new boyfriend.

As pertinent to this appeal, Dabu also asserted that, following their separation, Tei engaged in a persistent campaign of harassing her and disturbing her peace through emails, texts and voicemails primarily relating to custody of Anna. Typical of the messages Dabu offered in support of this claim, Tei wrote, "You don't deserve having a child." "Burn in hell." "You are the seed of Satan." "You are evil, manipulating and a liar." "You are a horrible mother." "You need therapy." "I hope you rot in hell." "I will be just as relentless as you are nuts."

Dabu sought application of section 3044 and requested sole physical and legal custody of Anna with Tei limited to monitored visitation.

### 3. *The Trial*

Trial was held over four days in November and December 2017. Both Dabu and Tei were represented by counsel. The court heard testimony from Dabu and Tei and seven other witnesses, including two experts on issues of deceptiveness.

Dabu testified she "felt intimidated or harassed" by many of Tei's messages and described them as "angry, intimidating, harassing, and accusatory."[3] She explained that many of these

---

[3] The court overruled Tei's objections that Dabu was providing improper opinion testimony, explaining, "I've had this problem with so many of her answers, that she uses conclusory terms. It's not—she's not an expert and so—I won't sustain the objection that she is giving improper opinion. On the other hand, it is of absolutely minimal, if any, value to the Court to have somebody come in and give such conclusory testimony. So it goes

messages followed brief telephone conversations between Tei and Anna, who was not yet four years old, after Dabu ended the call without explanation. She gave as an example calls in February 2017: "Anna, being three and a half years old, would not want to talk at length on the phone, and so would either refuse to talk at all or briefly come onto the phone and say, 'Hi, Daddy. Bye, Daddy.' And Todd would try to—Todd would say things like, 'Honey, why don't you talk to me. Please talk to me. Don't you want to talk to your dad?' until such time as I hung up. And then the usual pattern would be I would get another call and/or voicemail and/or email."

During his testimony Tei explained the messages were a "reaction of frustration" to being away from his daughter while she was with Dabu and not being allowed to speak to her. "I'm continuously frustrated, hurt, worried, that my daughter hasn't spoken to me, and I want to know she's okay and I don't—I don't know how she feels. I don't know anything because I haven't seen her. And I just want to say, 'Hello. How are you? Daddy loves you,' and that's it." He continued, "I mean my frustration is obviously in the email. They just respond right away. Because, like, I hang-up, and I'll send this email, and I'm just frustrated."

to the weight but not to the admissibility, and the objection is overruled."

### 4. *The Tentative Statement of Decision and Judgment on Reserved Issues*

The court issued a 15-page tentative statement of decision after trial on January 24, 2018. The court found Dabu's testimony "not entirely credible after considering her demeanor, bias and motives, particularly her express intent to eliminate any significant involvement of Respondent in the child's life." It found the testimony of Tei "credible in large part." The court also found both Dabu and Tei had an "overall commitment to the child's health, safety, and welfare, although they disagree on how to ensure this goal."

With respect to Dabu's allegations Tei had sexually and psychologically abused her when she was still a minor, evaluating the testimony of Dabu and Tei, who denied any sexual activity prior to marriage, the court found Dabu did not carry her burden of proof, noting Dabu's "bias and motive to fabricate were obvious." As for the claims of domestic violence within the meaning of section 3044, the court rejected a stalking claim, which it found involved Tei circling the block while looking for a parking place; the claim Tei had threatened her because it was a single statement without any other facts that would make it reasonable to view as an actual threat to harm her; and a harassment claim that consisted of Tei once pounding on Dabu's door and calling out to see if anyone was home on other occasions during a time when there was no agreed schedule for visitation and Dabu and Tei frequently blocked each other's calls, which meant Tei had to come to Dabu's residence to request visitation. Under the circumstances, the court ruled, Tei's conduct "appears appropriate and did not constitute harassment."

The court continued, "The conduct by Todd that was not appropriate during this period was the language used by Todd in his communications with Nancy." Although problematic, the court determined Tei's messaging did not trigger the presumption in section 3044 because of the context in which it occurred (the noncustodial telephone calls between Tei and Anna): "When, in Nancy's view, the child did not want to talk or lost interest in talking, then Nancy simply terminated the call. Todd, who was not physically present, had no idea why Nancy had terminated or blocked a call, so he called again. Nancy ignored these calls, either by not answering them at all, or she answered and immediately hung up on him without explanation. Nancy seemed genuinely outraged that Todd would continue to call back again and again. She was unable and unwilling to see how her behavior would appear to Todd, *i.e.*, that she had, for no good reason, terminated and blocked his communication with the child. As Todd's frustration grew, he sent voice messages, text messages, and emails that were disproportionate in number and inappropriate in language."[4]

Focusing on these episodes and other instances in which the parties' inability to communicate was of concern, the court concluded Dabu's and Tei's "inability to exercise joint legal custody is apparent."[5] Accordingly, the court did not award joint

---

[4] The court noted Tei's communication skills had markedly improved once the parties were ordered to use OurFamilyWizard, a website for divorced and separated parents to communicate regarding coparenting matters. (See *Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 899.)

[5] The court observed that Dabu and Tei have "very different personalities, opinions, and decision-making styles." Dabu is "a

6

legal custody; nor did it award sole legal custody to one parent. Instead, "in order to keep both parents involved in the child's life while minimizing the need for communication between the parents, the Court awards each parent sole legal custody on certain issues, with the other parent entitled to have full access to records and personnel." The court awarded sole legal authority on all health issues to Tei; all legal authority on educational decisions to Dabu. The court additionally adopted a physical custody schedule that allowed each parent weekend time and also weekday time to exercise his or her separate legal authority. As the court explained, under the parenting schedule Tei would have a physical custody timeshare of 31 percent.

Dabu filed objections to the proposed statement of decision on February 5, 2018. In addition to challenges directed to the court's rejection of her claims Tei had abused her when she was a minor, Dabu argued the court had not adequately addressed her contention Tei's emails, texts and voicemails constituted domestic violence in the form of disturbing the peace. Dabu also asked the court to modify its findings to state that many of Tei's

---

strong, independent, 'take-charge' person who makes quick decisions that she believes are the best for the child and is impatient of the need for consultation and joint agreement with Todd. She is convinced that Todd preyed on her when she was a child and finds it impossible to trust him as a parent of their own child or to give his views consideration." Tei is a "slower decision-maker who becomes easily frustrated and has vented his anger at Nancy inappropriately in e-mails and other communications. He recognizes that Nancy is trying to push him out of the child's life and so he is suspicious of her motives in any decision." These differences, the court concluded, "make joint decision-making impossible."

7

inappropriate messages were "sent without provocation." Tei also filed objections, asking the court to revise its decision to award Dabu a custody timeshare of more than 50 percent.

The court rejected all objections and declined the request for additional or different findings. With respect to Dabu's objections related to her claims that Tei's communications following separation disturbed her peace and constituted domestic violence, the court reiterated that Tei's "communications were very troublesome but, after considering all the evidence, the Court reached the conclusion set forth in its statement of decision."

Judgment on Reserved Issues was entered May 17, 2018, awarding Tei sole legal authority on all health decisions with additional details regarding notice to Dabu. Dabu was awarded sole legal authority on all educational decisions. Decisions on issues not specifically addressed in the judgment were to be made by the parent with custody at that time, "provided that the decision does not interfere with the custodial time of the other parent." The judgment's physical custody/parenting plan specified Anna would be with Tei every first, third and fifth weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m. and every Tuesday from 2:00 p.m. or the end of school to Wednesday at 5:00 p.m. Anna was to be with Dabu all times not designated as Tei's custodial time. The judgment also resolved the issues of child support, sanctions and attorney fees.

Dabu filed a timely notice of appeal.[6]

---

[6] Shortly after Dabu's notice of appeal was filed, the Los Angeles County Department of Children and Family Services filed a petition on Anna's behalf pursuant to Welfare and Institutions Code section 300. The juvenile court sustained an

8

**DISCUSSION**

1. *Governing Law*

"California's statutory scheme governing child custody and visitation determinations is set forth in the Family Code . . . . Under this scheme, 'the overarching concern is the best interest of the child.' [Citation.] [¶] For purposes of an initial custody determination, section 3040, subdivision (b) [now subdivision (c)7], affords the trial court and the family '"the widest discretion to choose a parenting plan that is in the best interest of the child."' [Citation.] When the parents are unable to agree on a custody arrangement, the court must determine the best interest of the child by setting the matter for an adversarial hearing and considering all relevant factors, including the child's health, safety, and welfare, any history of abuse by one parent against any child or the other parent, and the nature and amount of the child's contact with the parents." (*In re Marriage of Brown*

---

amended petition and declared Anna a dependent of the court. On August 9, 2019 the juvenile court terminated dependency jurisdiction, stating, "The Court reverts back to the original family law decision—no Juvenile Custody Order is required for this case." Tei's contention this order moots Dabu's appeal is not well taken, as we indicated when we denied Tei's motion to dismiss the appeal.

7 Former section 3040, subdivision (b), was redesignated without change as subdivision (c), effective January 1, 2013. (See Stats. 2012, ch. 845, § 1.) It provides, "This section establishes neither a preference nor a presumption for or against joint legal custody, joint physical custody, or sole custody, but allows the court and the family the widest discretion to choose a parenting plan that is in the best interest of the child."

*& Yana* (2006) 37 Cal.4th 947, 955-956; accord, *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 14; see § 3011, subds. (a) & (b).)

Notwithstanding this broad discretion, section 3044 creates a rebuttable presumption that sole or joint physical or legal custody of a child should not be given to a parent who has perpetrated domestic violence: "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against the other party seeking custody of the child, or against the child or the child's siblings . . . there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Sections 3011 and 3020. This presumption may only be rebutted by a preponderance of the evidence." (§ 3044, subd. (a).) "The legal effect of the presumption is to shift the burden of persuasion on the best interest question to the parent who the court found committed domestic violence." (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 662; accord, *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 334.)

Section 3044, subdivision (c), provides an expansive definition of the phrase "perpetrated domestic violence" for purposes of the subdivision (a) presumption: "[A] person has 'perpetrated domestic violence' when the person is found by the court to have intentionally or recklessly caused or attempted to cause bodily injury, or sexual assault, or to have placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or to have engaged in behavior involving, but not limited to, threatening, striking, harassing, destroying personal property, or disturbing the peace of another,

10

for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the child or to protect the child and the child's siblings."

"Disturbing the peace" of another within the meaning of California's domestic violence statutes means "conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497; accord, *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 820; see *Phillips v. Campbell* (2016) 2 Cal.App.5th 844, 853 [""the plain meaning of the phrase 'disturbing the peace' in section 6320 may include, as abuse within the meaning of the DVPA [Domestic Violence Prevention Act], a former husband's alleged conduct in destroying the mental or emotional calm of his former wife""]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146 [same].)

Once the court finds a party seeking custody of a child has perpetrated domestic violence, section 3044, subdivision (b), sets forth detailed criteria that must be evaluated before the court may find the presumption mandated by subdivision (a) has been rebutted.[8] Subdivision (f) requires the court, in determining the

---

[8] Section 3044, subdivision (b), provides, "To overcome the presumption set forth in subdivision (a), the court shall find that paragraph (1) is satisfied and shall find that the factors in paragraph (2), on balance, support the legislative findings in Section 3020. [¶] (1) The perpetrator of domestic violence has demonstrated that giving sole or joint physical or legal custody of a child to the perpetrator is in the best interest of the child pursuant to Sections 3011 and 3020. In determining the best interest of the child, the preference for frequent and continuing contact with both parents, as set forth in subdivision (b) of Section 3020, or with the noncustodial parent, as set forth in

11

presumption has been overcome, to make specific findings on each of the factors listed in subdivision (b) (§ 3044, subd. (f)(1)) and to state its reasons in writing or on the record (§ 3044, subd. (f)(2)).

"The clear terms of section 3044 require that a court apply a presumption that it is detrimental to the best interest of the child to award joint or sole physical or legal custody to a parent if the court has found that that parent has perpetrated any act of domestic violence against the other parent in the preceding five years. The presumption is rebuttable, but the court *must* apply the presumption in any situation in which a finding of domestic violence has been made. A court may not '"call . . . into play" the presumption contained in section 3044 only when the court believes it is appropriate.'" (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1498; see *Celia S. v. Hugo H.*, *supra*,

---

paragraph (1) of subdivision (a) of Section 3040, may not be used to rebut the presumption, in whole or in part. [¶] (2) Additional factors: [¶] (A) The perpetrator has successfully completed a batterer's treatment program that meets the criteria outlined in subdivision (c) of Section 1203.097 of the Penal Code. [¶] (B) The perpetrator has successfully completed a program of alcohol or drug abuse counseling, if the court determines that counseling is appropriate. [¶] (C) The perpetrator has successfully completed a parenting class, if the court determines the class to be appropriate. [¶] (D) The perpetrator is on probation or parole, and has or has not complied with the terms and conditions of probation or parole. [¶] (E) The perpetrator is restrained by a protective order or restraining order, and has or has not complied with its terms and conditions. [¶] (F) The perpetrator of domestic violence has committed further acts of domestic violence."

3 Cal.App.5th at p. 661 ["[t]his presumption is mandatory and the trial court has no discretion in deciding whether to apply it"].)

2. *Standard of Review*

On appeal custody orders are generally reviewed for an abuse of discretion (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 ["[t]he precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child"]), and the family court's factual findings under the substantial evidence standard. (*Id.* at pp. 31-32; accord, *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255; see *In re Marriage of McKean* (2019) 41 Cal.App.5th 1083, 1089; *Jaime G. v. H.L.* (2018) 25 Cal.App.5th 794, 805.)

Here, however, it was for Dabu to establish in the first instance that section 3044's presumption applied. Because the family court determined Dabu failed to present sufficient evidence Tei had perpetrated domestic violence within the meaning of the statute, the question on appeal is not whether substantial evidence supports the court's finding (see *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838), but whether a finding in Dabu's favor on this issue is compelled by the record. (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 ["[o]n appeal from a determination of failure of proof at trial, the question for the reviewing court is "'whether the evidence compels a finding in favor of the appellant as a matter of law'"]; see *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647.) ""Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial

determination that it was insufficient to support a finding.""""
(*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.*
(2018) 19 Cal.App.5th 258, 270; accord, *Petitpas v. Ford Motor
Co.* (2017) 13 Cal.App.5th 261, 302-303.)

   3. *The Evidence Does Not Compel a Finding That Tei*
      *Committed Domestic Violence*

This court has previously emphasized section 3044's
important role in requiring family courts, when making custody
decisions, to seriously evaluate the destructive impact of domestic
violence: "Presumptions are used in this context because courts
have historically failed to take sufficiently seriously evidence of
domestic abuse. [Citation.] [¶] 'Without such assumptions, it
has been too easy for courts to ignore evidence of domestic abuse
or to assume that it will not happen again. As with the
limitations on consideration of the gender of a parent or child,
presumptions function to counteract the proven tendency of some
courts to make judgments based on ignorance or stereotypes.'"
(*Jaime G. v. H.L.*, *supra*, 25 Cal.App.5th at p. 806.)

As discussed, for the presumption to apply, the family court
must first find a party seeking custody has perpetrated domestic
violence. Largely disbelieving Dabu, the family court found
Dabu's evidence insufficient to establish she had been abused by
Tei within the meaning of section 3044. Dabu does not challenge
the family court's determinations regarding her allegations of
sexual abuse when she was a minor or her claims Tei stalked and
threatened her. She limits her argument on appeal to the court's
failure to find Tei's inappropriate emails, text messages and
voicemails disturbed her peace and, therefore, constituted
domestic violence.

14

Tei's angry messages were unquestionably inappropriate, as the family court stated. But a finding they constituted "disturbing the peace" and, therefore, domestic violence within the meaning of section 3044 required not only an evaluation of Tei's conduct but also an assessment of its impact on Dabu—did the stream of messages destroy Dabu's mental or emotional calm? (See, e.g., *Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, 579-580 [affirming trial court's restraining order issued under the Domestic Violence Prevention Act (DVPA); "Ervin's distribution of information about Altafulla's affair, which she plainly did not want to share with her coworkers, relatives, and friends, did cause and no doubt was calculated to cause, Altafulla grave emotional distress"]; *In re Marriage of Nadkarni*, *supra*, 173 Cal.App.4th at pp. 1498-1499 [reversing trial court order dismissing application for a restraining order on the ground the alleged conduct was insufficient to constitute abuse within the meaning of the DVPA; "[w]e assume, without deciding the truth of Darshana's allegations, that Datta's conduct . . . caused her to suffer 'shock' and 'embarrassment,' to fear the destruction of her 'business relationships,' and to fear for her safety. In other words, Datta's conduct with respect to Darshana's e-mail account, as stated in her declaration, allegedly caused the destruction of her mental or emotional calm and could, if found to be true, constitute 'disturbing the peace of the other party'"].)

Here, based on the nature of the parties' contentious relationship regarding Anna, which provided the backdrop for Tei's communications, as well as the court's serious doubts as to Dabu's credibility, the family court concluded the impact of Tei's messages, troublesome as they may have been, did not reach the threshold required to constitute domestic abuse. As discussed,

after observing Dabu's testimony, the court found her "not entirely credible," noting her bias and motive to fabricate in an effort to win sole legal and physical custody of Anna. And specifically with respect to Dabu's conclusory assertions she felt harassed and intimidated by Tei's messages, the court stated her testimony was "of absolutely minimal, if any, value" to the court. The significance of the circumstances in which Tei's messages were sent and Dabu's credibility in describing her reaction to them are not matters for us to judge in the first instance. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319 [""'[t]he trier of fact is the sole judge of the credibility and weight of the evidence"'"]; accord, *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099; see *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979 ["As the trier of fact in this case, the trial judge was the exclusive judge of the credibility of the evidence. [Citation.] In that role, the judge may reject any evidence as unworthy of credence, even uncontradicted testimony"].) Although the evidence could have supported a finding of domestic violence, the record did not compel such a finding as a matter of law.[9]

Dabu's additional argument the family court erred by creating a "no-provocation requirement" that improperly excused

---

[9] Citing this court's decision in *Jaime G. v. H.L.*, *supra*, 25 Cal.App.5th at page 805, which held the family court must make specific findings about each of the seven factors identified in section 3044, subdivision (b), before finding the subdivision (a) presumption has been rebutted, Dabu urges us to find the family court erred by failing to make equally specific findings when ruling she failed to establish Tei had committed domestic violence. The statute contains no such requirement.

16

Tei's abusive messages is misplaced.  The court's tentative statement of decision did no such thing.  Fairly read, the court's discussion of the context in which Tei sent angry emails and text messages to Dabu was a necessary aspect of its determination that those messages, however problematic, did not destroy Dabu's mental or emotional calm.  Far from creating an additional, nonstatutory requirement for proof of domestic violence, established caselaw requires the family court to evaluate all the circumstances in which the allegedly abusive conduct took place to determine if it disturbed the peace of another.  (See *Altafulla v. Ervin, supra,* 238 Cal.App.4th at pp. 579-580.)

## DISPOSITION

The family court's order is affirmed.  Tei is to recover his costs on appeal.


PERLUSS, P. J.


We concur:


SEGAL, J.


DILLON, J.*

---

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17