Filed 6/27/23; Certified for Partial Pub. 7/26/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ONIKA VINSON,<br><br>    Plaintiff and Appellant,<br>v.<br>EDRIC KINSEY,<br><br>    Defendant and<br>Respondent. | A166582<br><br>(Alameda County<br> Super. Ct. No. HF22124020) |

Onika Vinson appeals from the denial of her request for a domestic violence restraining order (DVRO) under the Domestic Violence Protection Act (DVPA) (Fam. Code, § 6200, et seq.[1]) against Edric Kinsey, her former boyfriend and the father of two of her children.  She contends the trial court used an improper standard in evaluating whether threats Kinsey made constituted abuse, failed to consider evidence of other forms of abuse and failed to consider the totality of the circumstances as required by the DVPA.  She also argues the trial court erred in granting Kinsey unsupervised visitation without complying with statutory requirements for the order.  For the reasons explained in this opinion, we will reverse the order denying the

---

[1]  Further statutory references will be to the Family Code unless otherwise specified.

DVRO, conditionally reverse the visitation order and remand for further reconsideration.[2]

## BACKGROUND

On April 25, 2022, Vinson filed a request for a DVRO against Kinsey to protect herself, the two children she shares with Kinsey (then 6 and 10 years old) and her child from a different relationship (then 19 years old). Vinson also sought orders for legal and physical custody of the two younger children, with no visitation for Kinsey.

Vinson's request listed "March of 2022" (March incident) as the date of the most recent abuse. She stated that on that occasion, Kinsey asked her to take him to the grocery store and while they were talking in the car, he became "irate," "began threatening to beat my face in" and "stated that he would kill me." Vinson also described an incident in June 2020, when Kinsey took her phone out of her hand and, as she went to retrieve it, "he punched me in my face and pushed me on the floor," leaving her with a bruise on the left side of her face and on her left arm. Vinson stated that Kinsey had abused her "verbally, mentally, and physically for many years," from January 2010 to present; "continues to verbally abuse me"; "has threatened to kill me on numerous occasions"; and "shows up at my house unannounced any time he chooses"; that she was "in fear of my life because I don't know

---

[2] As Kinsey did not file a respondent's brief, we decide this case on the record on appeal and appellant's opening brief and oral argument. (Cal. Rules of Court, rule 8.220(a)(2).) (*In re Marriage of D.S. and A.S.* (2023) 87 Cal.App.5th 926, 930, fn. 3.)

We have also considered the views expressed in an amicus brief filed, with our permission, by the University of California, Irvine School of Law, Domestic Violence Clinic.

Further references to rules will be to the California Rules of Court.

when he will show up"; and that she did not have specific dates of abuse because she could not remember them all. Vinson described the injuries she had suffered as "[b]lack eyes, [b]ruises, [m]ental injuries."

Vinson further stated that her children needed protection because Kinsey "has a history of violence towards me," "they are my children and they live with me," and her eldest son had "witnessed a lot of verbal abuse from [Kinsey]" and "seen injuries caused to me after some of the physical altercations." Vinson stated that Kinsey has anger issues, she had tried coparenting with him and "he never follows through," and he "has threatened to take the children from me every time he becomes angry with me."

In support of her DVRO request, Vinson submitted signed "sworn statement[s]" from relatives and a friend. Most of these statements related having witnessed Kinsey verbally abusing Vinson and having seen Vinson's injuries; one witness observed Kinsey punching holes in Vinson's wall and breaking her furniture. The statements asserted that Kinsey had been uninvolved in his children's lives.[3]

---

[3] Vinson's mother told the court that Kinsey had punched holes in the wall of Vinson's home, hit her in the face and fractured her nose on Mother's Day in 2012, punched her in the face in January 2016, and "assaulted [her] in her home" in 2020. She stated that Kinsey was arrested for the first three of these incidents but not the fourth; that Kinsey had a history of "twisting the truth" concerning Vinson and the children; that he had "never been an involved parent," and that she had "begged" Vinson "to not let this man come around for fear he may one day follow through on his threats to kill her."

Vinson's best friend stated that Vinson told her numerous times of ongoing verbal and physical abuse by Kinsey and told her that Kinsey had "pretty much abandoned the children."

A relative stated that she had witnessed Kinsey verbally abuse Vinson and "the aftermath of the injuries of [Kinsey's] assault on her"; that Kinsey had been violent toward Vinson for as long as the witness had known him

3

Vinson also submitted numerous texts from Kinsey to document threats to hurt or kill her.  For example, Kinsey's texts included, "I know what it is u dint want me to find out who it is bcuz when i do that will be your last breath on this earth"; "No u dont u no nothing of me u assume so much it makes me wanna slap u"; "Ima kill u before this world ends mark my words dont matter how its done you will feel every inch of pain u cause me"; "Na im 4real ur dead to me bare hands an all"; "Should've snapped your neck . . ."; "Just know at this point in life i will kill u and any nigga that stops me from being a dad to my kids period . . . Im not taking NO or leave for a answer im coming for what I created"; "Na how bout ima beat yo ass for lying to me." After texts from Vinson referring to Kinsey having hit her in the mouth while she was driving, punched her in the side of her head "over a broad" when they were "sitting at Alex school," and "fractured [her] nose on Mother's Day," Kinsey responded, "No i hit you bcuz u keep talkin sht like u know

---

and has "severe anger issues"; and that Kinsey "does not provide any emotional support and very little financial support of their children."

Vinson's nephew stated that he saw holes Kinsey punched in Vinson's wall and "witnessed many verbal attacks against [Vinson] as well as seeing injuries from [Kinsey's] physical attacks"; that when confronted about the abuse, Kinsey "portrays himself as the victim"; and that "[f]rom what I know he has never been a father to" the children.

Vinson's niece stated she had seen "the numerous injuries [Kinsey] has caused" to Vinson; Kinsey has never "been a father" to the children and was "known for defaming [Vinson] on social media saying that she won't allow him to see the children"; and "[t]he amount of emotional and physical pain he has inflicted on [Vinson] should not happen to any woman."

Another niece stated she had "witnessed on numerous occasions violent outburst[s]" from Kinsey toward Vinson, "witnessed [Kinsey] destroy her property by punching holes in her walls and break some of her furniture," "witnessed him verbally attack her" and "seen the injuries on her from his physical attacks"; and that Kinsey had "never been an active parent" to his children.

4

everything i do and when im speaking what really happen stop over talking me with bitch BS."

The trial court issued a temporary restraining order and child custody order pending a hearing set for May 12, 2022.

The parties appeared in propria persona at the hearing, which was held remotely. The court first questioned Vinson about the March incident described in her application, when she and Kinsey were going to a grocery store. Vinson explained that Kinsey would share his monthly food stamps with her "for the kids to give the kids food" and she would take him to the grocery store because he did not have a vehicle. She testified that while the two of them were sitting in the car in front of his house before going to the grocery store, Kinsey got mad and threatened to "beat [her] face in" and to kill her, as he had on other occasions. The court asked why, if he had threatened her numerous times, she would "even go around him" and be alone in a car with him, and she explained, "he plays on my sympathy. And he'll start crying. And I have—and I have a soft heart. I mean, you know. And we do have children together. I mean, that's my stupidity."

Vinson did not remember the date of the incident but testified it was at the beginning of March, and the court asked why she waited until April 25 to file her request for a restraining order. Vinson responded that Kinsey treated her and the children to an outing he had planned for their daughter's March 30 birthday but afterward they got into a verbal altercation. The court interjected, "[l]et me make sure I understand this . . . [¶] He threatened to kill you . . . [¶] multiple times . . . [¶] but you let him in your car in early March? . . . [¶] And you said for the sake of the children, but no children were present. [¶] And then because it was your daughter's birthday at the end of March and he made plans that you wanted to benefit from, either you or your

5

child or both, that you decided to wait to file a request for a restraining order until April; is that correct?" Vinson responded, "No. No. No. [¶] He and I had got into it again afterwards. The threats come in—I have this documented, the threats coming in of killing me. And then he—he was supposed to do something for his children, which he did not because his—as always, he's never consistent with his kids. He's never around them. His friends is priority over his children." The court asked if she was saying Kinsey had not taken the children for the outing as planned and Vinson said, "No. We went together—he doesn't do anything with them. I'm the sole caretaker and provider. He's never done anything outside of me with his children. Nothing."

At this point, the court asked Kinsey for his response to the allegations that he threatened to kill Vinson and "beat her face in." Kinsey testified, "during the time of that threat, I can recall that. . . . I was dealing with something very personal within myself, and at the time me and [Vinson] have moments where—or pocket moments where me and her, we kindle each other's time. . . . [¶] I did not threaten to beat her face in. I said—I specifically told her—I said— this is the type of stuff that will make me react this way, but I'm not directly telling you that I'm going to do this to you." The court asked if he threatened to kill her and Kinsey replied, "No. I have not threatened to kill her multiple times. [¶] I said that when the death of my mother came and she abandoned me. . . . [T]hese allegations about me threatening her all come from after my mom died. [¶] My mom died four or five years ago. . . . [¶] The only time . . . she utilizes this to explain it to me is when she has another relationship. She utilizes the fact that I'm cheating on her. I don't understand how I'm cheating on her if we're not together. I don't understand how I'm a deadbeat when I've been trying to reach out to her to

6

spend time.  I can't help it that I go out here to bust my back to get a job that's not going to pay me enough money to provide for my kids."

Regarding the March incident, which Kinsey said was on March 7, Kinsey testified, "We get in front of the grocery store.  After we leave my house, we get in front of the grocery store. We have positive talks.  We're laughing.  Everything is going good. [¶] I reach out to her about wanting my family back.  I reach out to her about me wanting to do more and trying to do more by supporting.  She told me that she don't love me no more.  She don't care about me no more.  That— that—that technically me expressing myself never matters to her. [¶] So right now she's moved on.  She don't care about what I have going on.  If I'm struggling, so—well, so be it.  I'm just going to take the kids and leave."  The court asked how this made Kinsey feel and Kinsey replied, "It hurt.  It hurts.  It will make me upset.  It breaks my heart."

When the court asked if they had an argument, Kinsey testified, "Yeah. We had the argument about the—it's the lies of you telling me one moment we're going to do this together.  And I work myself up or go get a job or arrange my time to want to do these things.  Then when I actually have the free time on the days off, when I call you, first thing comes out of your mouth is 'I'm busy.'  Or your daughter's asleep or your son is doing this. [¶] I can't— now I can't see them?  So I can't come—I can't come and just spend time with one of them? [¶] It's like I have to go through these arguments and debates with her about my time—my job. [¶] Like right now I worked.  I had to take today off because of the hearing, which also affects the fact that I got child support later for $800.  I don't even make that on my checks.  I get paid $17 an hour."  Kinsey told the court he almost lost his job when Vinson sent the temporary restraining order to his workplace.

The court asked for any response from Vinson, who said that Kinsey was "telling a blatant lie." Vinson stated, "I submitted evidence of him threatening to kill me," and said Kinsey had "begged [her] to be back with him" but she was "not getting back with an abuser." After some cross talk, the court said it had heard enough, asked if the case was submitted and issued its ruling as follows:

"The request for a restraining order was filed in March—was filed on April 25th, 2022, for an incident that occurred in early March, possibly March 7th, 2022. [¶] The Court doesn't understand why there was a delay in requesting the restraining order, but perhaps it's because despite the fact that Ms. Vinson repeats that she's been repeatedly threatened by Mr. Kinsey, she repeatedly goes back and has contact with Mr. Kinsey. So it's clear to the Court that she's not particularly concerned about his comment that he will kill her. [¶] I don't know if that's a colloquialism. I don't know if that's just a phrase, but it has no meaning. So she's asking the Court to interpret the meaning of that as being an attempt to engage in a violent act or the threat of violence. But at the same time she doesn't act like it's a threat of violence. And for those reasons as well as issues of credibility, the Court denies the request for the restraining order." The court stated that the parties needed visitation orders, referred them to Family Court Services and continued the matter.

The Family Court Services report made three recommendations: First, that the children continue to reside primarily with Vinson; second, that Kinsey have professionally supervised visits for up to two hours every other weekend and, after completing four such visits without incident, progress to unsupervised visits for two hours every other weekend with supervised exchanges; and, third, that the parties participate in individual therapy to

"work on emotional growth and healing in an effort to develop a healthy and effective coparenting relationship." The court read each recommendation to the parties and asked for any objection to each one; neither party objected, and the court adopted the recommendations as its order.

The court filed its Findings and Orders After Hearing on May 18, 2022.[4]

Vinson filed a timely notice of appeal on November 7, 2022.[5]

## DISCUSSION

## I.

### *The Order Denying a Restraining Order Must Be Reconsidered.*

#### A. General Principles

"Under the DVPA, a court may issue a protective order ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." ' (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782.) The statute should 'be broadly construed in order to accomplish [its] purpose' of preventing acts of domestic violence. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498.)" (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115 (*F.M.*).) "We review the trial court's grant or denial of a DVPA restraining order request for an abuse of discretion." (*Ibid.*)

---

[4] The court had filed Findings and Orders After Hearing on May 17, 2022, that appear to be identical to those filed the next day except that one page was missing.

[5] The notice of appeal states that the appeal is from the court's May 12 and May 18, 2022 orders. Appellate counsel represents that neither the trial court clerk nor any party served notice of entry of the court's order. The notice of appeal was filed within 180 days of the filing of the court's order. (Rule 8.104(a)(1)(C).)

9

As relevant in this case, the DVPA defines " '[d]omestic violence' " as "abuse perpetrated against" a person "with whom the respondent is having or has had a dating or engagement relationship," a person "with whom the respondent has had a child," or "[a] child of a party." (§ 6211, subds. (c), (d), (e).) " 'Abuse' includes intentionally or recklessly causing or attempting to cause bodily injury, placing a person in reasonable apprehension of imminent serious bodily injury, or engaging in behavior that could be enjoined under section 6320. (§ 6203.)" (*F.M., supra,* 65 Cal.App.5th at p. 115.) Conduct that may be enjoined under section 6320 includes "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ." (§ 6320, subd. (a).)

**B. Analysis**

As described above, the trial court denied Vinson's request for a restraining order because it concluded that the fact she continued to have contact with Kinsey meant she was "not particularly concerned" about his "comment that he will kill her," which comment the court stated, "has no meaning." Vinson contends the court improperly heightened her burden of proof by requiring her to prove that Kinsey threatened her with violence and caused her to fear for her safety when the DVPA requires only proof that he threatened her. She also contends the court erred by failing to consider other types of abuse shown in the record and narrowly focusing on the timing of the application, her continued contact with Kinsey and unspecified credibility concerns without considering the totality of the circumstances.

"Threatening" the other party comes within the statutory definition of "abuse" through the incorporation of "behavior that has been or could be

10

enjoined pursuant to section 6320" described in section 6203, subdivision (a)(4). "Threatening" is listed in section 6320 without qualification by the type of threat or effect of the threat on the person threatened. By contrast, section 6203, subdivision (a)(3), separately defines "abuse" as including "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another." As Vinson points out, if the only threats constituting abuse are threats of violence that cause the recipient reasonable fear of serious bodily injury, threatening conduct could be the basis of a restraining order under section 6203, subdivision (a)(4), only if it was also abuse under section 6203, subdivision (a)(3)—rendering subdivision (a)(4) meaningless as to this form of conduct.

Moreover, threats that do not directly refer to physical violence or cause reasonable fear of bodily harm may still constitute harassment or disturbing the peace of the recipient, which are separately enjoinable under section 6320 and therefore forms of abuse under section 6203, subdivision (a)(4). The DVPA clearly protects against more than just physical violence and threats thereof. (E.g., *In re Marriage of Nadkarni, supra,* 173 Cal.App.4th at p. 1498 [disturbing peace by "destroying the mental or emotional calm" of other party is abuse under DVPA]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144-1147 [repeatedly calling, emailing, texting and coming unannounced to home of former girlfriend and refusing to leave constituted disturbance of her peace and abuse under DVPA].) Here, the trial court appears to have taken the view that Vinson was not entitled to a DVRO unless Kinsey caused her to fear bodily injury. This is too limited a view of the conduct covered by the DVPA.

Other aspects of the trial court's ruling are also troubling. Focusing primarily on the March incident, the court rejected Vinson's testimony that she believed Kinsey when he said he was going to kill her. The court did not explain its concerns with "issues of credibility," but it is evident from the trial court's questions and remarks that it saw Vinson's choice to maintain contact with Kinsey, and particularly to be in a car alone with him, as undermining her credibility. The court's conclusions that Kinsey's threat to kill Vinson "has no meaning" and Vinson "doesn't act like it's a threat of violence" effectively imposed on Vinson a singular vision of how an abused woman should act. But " '[a]ll women exposed to violence and abuse in their intimate relationships do not respond similarly, contradicting the mistaken assumption that there exists a singular "battered woman profile." Like other trauma victims, battered women differ in the type and severity of their psychological reactions to violence and abuse, as well as in their strategies for responding to violence and abuse.' " (*In re I.B.* (2020) 53 Cal.App.5th 133, 155, quoting Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome* (1993) 21 Hofstra L.Rev. 1191, 1225.)

Of course, "[c]redibility determinations . . . are subject to "extremely deferential review" (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579), and " '[a] trier of fact is free to disbelieve a witness . . . if there is any rational ground for doing so.' (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.)" (*F.M., supra,* 65 Cal.App.5th at p. 119.) But the court here adopted too cramped a view of how battered women should react to threats and abuse in rejecting Vinson's testimony that she believed Kinsey's threats and feared he would kill her. When the trial court asked Vinson why she would be alone with Kinsey in her car if he had threatened her numerous times, Vinson

12

explained that he "plays on my sympathy" and "we do have children together."  The court later commented, "you let him in your car in early March . . . [a]nd you said for the sake of the children, but no children were present."  This comment reflects a basic misunderstanding of Vinson's explanation, as the children's presence or absence on a single occasion is irrelevant to Vinson's point—that because she and Kinsey had two children in common, there was reason for her to be in contact with him, whether in general or, as on the occasion in March, to facilitate the specific goal of obtaining food with Kinsey's food stamps.

The court also indicated that it questioned Vinson's credibility due to her failure to file the request for a restraining order until approximately seven weeks after the March incident.  The court initially took Vinson's explanation as indicating she intentionally delayed filing her request because she wanted the benefit of the plans Kinsey had made for their daughter's birthday ("because it was your daughter's birthday at the end of March and he made plans that you wanted to benefit from, either you or your child or both, that you decided to wait to file a request for a restraining order until April").  Vinson said this was not what happened and explained that she and Kinsey "got into it again" after the birthday outing, referring to "threats coming in of killing me" and Kinsey not doing something he was supposed to do for the children.  In its ruling, the court said it "doesn't understand why there was a delay in requesting the restraining order" and "perhaps" it was because Vinson was not really concerned about Kinsey's "comment that he will kill her."

The court was entitled to consider the timing of the restraining order request as part of the totality of the circumstances.  But "[t]he length of time since the most recent act of abuse is not, by itself, determinative."  (§ 6301,

13

subd. (c).) Vinson's explanation suggests she decided to file her restraining order request after an additional altercation subsequent to the March incident, not that she decided to seek a restraining order after the March incident and intentionally delayed doing so (although she was not asked to, and did not, explain why her request listed the March incident as the most recent abuse). More importantly, the trial court's focus on the time between the March incident and filing of the restraining order request ignores the parties' overall history over the course of a decade-long relationship and the recognized difficulty of leaving an abusive relationship.[6] (See *In re I.B., supra,* 53 Cal.App.5th at p. 156.)

The hearing in the present case was brief, and the court's inquiry of the parties focused on the March incident and Vinson's general allegations that Kinsey had threatened to kill her numerous times in the past. The court did not address Vinson's statements in her restraining order request that Kinsey punched her in the face and pushed her to the floor in June 2020, abused her "verbally, mentally, and physically for many years," and "shows up at my house unannounced any time he chooses," leaving her being "in fear of my life because I don't know when he will show up."

Nor did the court address the contents of the texts Vinson submitted. As described above, Kinsey's texts document repeated threats to hurt or kill Vinson, expressions of regret at not having hurt her in the past, and an admission that he hit Vinson on one occasion. The texts also reflect Kinsey's

---

[6] " '[L]eaving an abusive relationship or ending violence is a complex process.' " (*I.B., supra,* 53 Cal.App.5th at p. 156, quoting *Transforming Domestic Violence Representation* (2013) 101 Ky. L.J. 483, 525.) " 'Studies have found that many abuse survivors attempt to leave a violent relationship *five to seven times* before they are able to fully do so.' " (*I.B.,* at p. 156, quoting *Transforming Domestic Violence Representation,* at p. 523.)

14

refusal to accept the end of his relationship with Vinson, anger over her being in another relationship and threats to hurt himself if she did not give him the time he felt he deserved. For example, Kinsey texted, "No im not leaving sht alone fuck u thought nobody has ur time but me who da fuck unthink u are to give my pussy away my time my attention I ask for away . . . [¶] No im not leaving u alone until u bring yo ass to my house an in my fuckin bed and take this dick and ima get u pregnant again on my momma so u think im joking about you ur mines period til i die." Kinsey texted, "im so scared of u leaving i wanna kill myself for it happening bcuz what will i have to live then . . . [¶] Ill hurt myself for losing everuthing i worked so hard fornmy dream was to have kids and a family a wife and none of that is happening." Vinson's relatives' statements say they witnessed Kinsey verbally abusing Vinson, saw injuries resulting from his assaults (including, according to Vinson's mother and one of Vinson's texts to Kinsey, a fractured nose), and saw holes Kinsey punched in Vinson's wall. One of Vinson's relatives stated that she witnessed Kinsey punching the holes and breaking some of Vinson's furniture.

If admissible[7] and credited, this information would establish abuse within the meaning of the DVPA beyond threats—actual infliction of bodily

---

[7] A DVPA restraining order may be based upon "an affidavit or testimony." (§ 6300, subd. (a).) The witness statements Vinson submitted are in the form of letters to the court ("Dear Judge"), titled "Sworn statement" and signed after the declaration, "[t]his is my sworn statement and this statement is true as to what I have witnessed," or a substantively similar one. It appears Vinson, who was not represented by counsel, made some effort to present evidence in a legally acceptable form, and the record does not indicate Kinsey objected to the statements or the trial court found them inadmissible. (Rule 5.111(c) [absent timely objection that a declaration does not meet content requirements, "any objection will be considered waived, and the declaration may be considered as evidence"; if no ruling, objection presumed overruled].)

15

harm, destruction of property, and potentially harassment and disturbing the peace. As far as the record discloses, however, the trial court neither acknowledged nor evaluated any of this information. By focusing on the March incident without consideration of the history of physical abuse, verbal abuse and destruction of property that Vinson attempted to put in evidence, it is difficult to see how the trial court could have satisfied the statutory requirement that it consider "the totality of the circumstances in determining whether to grant or deny a petition for relief." (§ 6301, subd. (c).)

While we review the trial court's denial of Vinson's request for a restraining order for abuse of discretion, " '[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action . . . .' " ' (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 337.) Thus, 'we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose.' (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685.) ' "If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not

If the statements did not meet the requirements for an affidavit or declaration (e.g., based on personal knowledge (rule 5.111(b)(2)), statements admissible in evidence (*ibid.*), statement of date and place of execution (Civ. Proc., § 2015.5), declaration of truth under penalty of perjury (*ibid.*)), the court could and should have offered Vinson some guidance as to how deficiencies could be corrected. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 423 ["in administering the DVPA . . . , in light of the vulnerability of the targeted population (largely unrepresented women and their minor children), bench officers are 'necessarily expected to play a far more active role in developing the facts, before then making the decision whether or not to issue the requested permanent protective order.' (*Ross* [*v. Figueroa* (2006)] 139 Cal.App.4th [856,] 861"].)

properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]" [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation].' (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)" (*F.M., supra,* 65 Cal.App.5th at pp. 115-116.)

Here, the trial court focused narrowly on the March incident, indicated the threat Vinson described did not warrant a protective order because the court did not believe Vinson took this threat seriously, and gave no indication it considered the evidence Vinson submitted of additional threats and repeated verbal and physical abuse. We are compelled to conclude the court abused its discretion by denying the request for a DVPA restraining order without consideration of the totality of the circumstances. This is not to say the court was required to believe any or everything Vinson or any other witness said; the evidence was not undisputed, and we cannot say Vinson was entitled to the order she sought as a matter of law. (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 603 [appellate court unable to find DVRO required as matter of law where trial court did not make findings on disputed evidence].) But the DVPA's broad protective purpose and definition of abuse demands, and Vinson was entitled to, full consideration of her case. Accordingly, we reverse the order denying Vinson's request for a DVPA restraining order and remand for reconsideration of her request if she chooses to pursue it under presently existing circumstances.

## II.

Vinson contends the visitation order must be reversed due to the trial court's failure to comply with two statutory requirements for an order granting unsupervised visitation to a parent who has been alleged to have a history of abuse against the other parent. The first requirement is that the court must state its reasons for granting unsupervised visitation; the second is that the court specify the time, day, place and manner of transfer of the children for unsupervised visits. (§§ 3011, subd. (a)(5)(A); 6323, subd. (c).)

Section 3011, subdivision (a)(5)(A), provides: "When allegations about a parent pursuant to paragraph (2) or (4) have been brought to the attention of the court in the current proceeding, and the court makes an order for sole or joint custody or unsupervised visitation to that parent, the court shall state its reasons in writing or on the record. In these circumstances, the court shall ensure that any order regarding custody or visitation is specific as to time, day, place, and manner of transfer of the child as set forth in subdivision (c) of Section 6323."[8]

As relevant here, paragraph (2) of section 3011, subdivision (a), refers to "[a] history of abuse by one parent . . . against . . . [t]he other parent." (§ 3011, subd. (a)(2)(ii).) Section 6323, subdivision (c), provides that "[w]hen making an order for custody or visitation pursuant to this section, the court's order shall specify the time, day, place, and manner of transfer of the child for custody or visitation to limit the child's exposure to potential domestic conflict or violence and to ensure the safety of all family members."

---

[8] These requirements became applicable to orders for unsupervised visitation on January 1, 2022; previously, they had applied only to orders for sole or joint custody. (Stats. 2021, ch. 768, § 1.)

18

The visitation order reads as follows: "The father shall have the following parenting times: [¶] a. Professionally supervised visits for up 2-hours every other weekend. [¶] b. After completing four professionally supervised visits without incident, the father's parenting time shall progress to unsupervised for 2-hours every other weekend with supervised exchanges." Neither the written order nor the court's ruling on the record includes reasons for the visitation order or the details regarding transfers of the children required by section 6323, subdivision (c).

As Vinson points out, section 3011, subdivision (a)(5)(A), requires a statement of reasons when unsupervised visitation (or custody) is granted to a parent about whom "*allegations*" of abuse "have been brought to the attention of the court," as they were here. The visitation order thus does not satisfy the requirements of section 3011, subdivision (a)(5)(A). Subdivision (a)(5)(B) of the statute, however, provides that "[t]his paragraph does not apply if the parties stipulate in writing or on the record regarding custody or visitation." As earlier indicated, at the hearing the court read each of the visitation recommendations in the Family Court Services report to the parties. After reading each recommendation, the court asked if there were any objections, both parties responded "no," and the court then adopted that recommendation as its order. The parties' on-the-record acceptance of the visitation recommendations without objection is, in effect, a stipulation to the terms of the visitation order. This substantial, if not actual, compliance with section 3011, subdivision (a)(5)(B), made it unnecessary for the court to provide the statement of reasons otherwise required by subdivision (a)(5)(A).[9]

---

[9] The fact that the trial court did not find Kinsey committed the abuse Vinson alleged distinguishes the two cases Vinson cites in support of her assertion that the court's failure to comply with section 3011,

Nevertheless, our reversal and remand for reconsideration of the order denying Vinson's request for a restraining order makes it appropriate to conditionally reverse the visitation order as well, as error in the court's evaluation of Vinson's claim of abuse could undermine its determination of reasonable visitation.  In this regard, the current orders reflect some inconsistency in that while denial of Vinson's restraining order request indicates the court did not see Kinsey as a safety risk, the requirement that he have four *supervised* visits before "progress[ing]" to unsupervised visits suggests the court did have at least some safety concerns.  (See *Cueto v.*

---

subdivision (a)(5)(A), requires reversal of the visitation order.  In both cases, joint custody was awarded to a father whom the court found to have committed domestic violence against the mother (*Jaime G. v. H.L.* (2018) 25 Cal.App.5th 794, 796 (*Jamie G.*); *Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 189, 194 (*Abdelqader*)), triggering the statutory presumption that "an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child" (§ 3044, subd. (a)).  The section 3044 presumption is rebuttable, but a court that finds it rebutted is required to state its reasons, which must address all the factors set forth in section 3044, subdivision (b). (*Jaime G.,* at p. 805; *Abdelqader,* at p. 196.)  *Jaime G.* and *Abdelqader* found reversible error because the trial court failed to sufficiently state its reasons for finding the section 3044 presumption rebutted. (*Jaime G.,* at p. 809; *Abdelqader,* at pp. 198-199.)

Where, as here, the trial court does *not* sustain domestic violence allegations, the section 3044 presumption is not triggered; the need for a statement of reasons discussed in *Jaime G.* and *Abdelqader* is absent because there is no presumption to rebut.  Although section 3011, subdivision (a)(5)(A), requires a statement of reasons when unsupervised visitation (or custody) is granted to a parent *alleged* to have committed abuse, it does not necessarily follow that prejudicial error results when a trial court fails to state its reasons for granting such a parent unsupervised visitation or to specify details to limit the child's exposure to potential domestic violence and ensure family members' safety (§ 6323, subd. (c).)  It is reasonable to infer that when a trial court denies a DVRO, it does not view the alleged abuser as posing a safety risk.

20

*Dozier* (2015) 241 Cal.App.4th 550, 562 [trial court denied mother's application to renew protective order, but its subsequent comments to father that it would consider another protective order if he contacted mother suggested mother had demonstrated reasonable apprehension of future abuse].)[10] If the trial court issues a restraining order, it will necessarily have to reconsider the visitation order.

If the trial court on remand again denies the restraining order request, it may reinstate the present visitation order or may enter a new or modified order consistent with the evidence presented on remand and the views expressed in this opinion.

## DISPOSITION

The order denying the request for a restraining order is reversed and the matter is remanded to the trial court for reconsideration of the DVRO request if Vinson chooses to pursue it.

The visitation order is conditionally reversed. The visitation order shall be reconsidered in light of any further proceedings on the restraining order request. If the restraining order request is denied, the present visitation order may be reinstated, modified or replaced.

---

[10] The visitation order also fails to explain what would constitute an "incident" for purposes of the condition that unsupervised visitation occur only after four supervised visits "without incident."

21

_____

STEWART, P.J.


We concur.


_____

RICHMAN, J.


_____

MARKMAN, J. *


_Vinson v. Kinsey_ (A166582)

* Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ONIKA VINSON,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>EDRIC KINSEY,<br><br>     Defendant and<br>Respondent. | A166582<br><br>(Alameda County<br> Super. Ct. No. HF22124020) |

**BY THE COURT**:

The opinion in the above-entitled matter filed on June 27, 2023, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rules 8.1105 and 8.1110, it now appears that the opinion should be published in the Official Reports with the exception of part II of the Discussion, and it is so ordered.


Dated: _____  _____
                                       Stewart, P.J.

Trial Court:  Alameda County Superior Court

Trial Judge:  Hon. Boydine A. Hall

Counsel:

Latham & Watkins, Nicole C. Valco, Ward A. Penfold, and Tara A. McCortney; Family Violence Appellate Project, Jody Lewis Arati Vasan, and Jennafer Dorfman Wagner, for Plaintiff and Appellant.

Patricia Cyr and Jane Stoever for the University of California, Irvine School of Law, Domestic Violence Clinic as Amicus Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendant and Respondent.