Filed 6/9/15  Modified and Certified for Pub. 7/7/15 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CAROLINA ALTAFULLA, | D065980 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. DV038735) |
| JOHN ERVIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Christine K. Goldsmith, Judge.  Affirmed.


John Ervin, in pro. per., for Defendant and Appellant.

Godes & Preis, Robert M. Dato, Joseph M. Preis, Oliver B. Dreger; Moore, Schulman & Moore, Peggy L. Moore and Jeremy S. Boyer for Plaintiff and Respondent.

Defendant and appellant John Ervin challenges a restraining order issued against him under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.; DVPA).[1]

---

[1]    All further statutory references are to the Family Code unless otherwise indicated.

He also argues the trial court erred in failing to issue an order restraining his former domestic partner, plaintiff and respondent Carolina Altafulla.

The trial court's orders arise out of Ervin's discovery that Altafulla had been unfaithful. In response to the discovery of Altafulla's unfaithfulness, Ervin sent emails to Altafulla's employer and their mutual friends and attached a surveillance report that he believed established the unfaithfulness. More importantly, at the home he shared with Altafulla, and in fairly graphic terms, Ervin described oral copulation to Altafulla's 17-year-old and nine-year-old daughters, stated his belief Altafulla had engaged in oral copulation with another man, and then warned the girls about what he believed was a risk they could contract sexually transmitted diseases from towels their mother might use. In an apparent further effort to traumatize the children, Ervin began dismantling their bedroom furniture. Altafulla's 17-year-old daughter was in fact so traumatized by Ervin's behavior that she required inpatient care at a mental health facility, which would not release her until Ervin had moved out of the home.

Among other claims, Ervin contends this record is not sufficient to support a DVPA restraining order. We disagree. Ervin's email campaign and emotional abuse of Altafulla's daughters amounted to conduct that was alarming, annoying and harassing, served no legitimate purpose, would cause a reasonable person substantial emotional distress, and actually did cause substantial emotional distress. As such, Ervin's conduct constituted harassment within the meaning of the DVPA and was therefore sufficient to support issuance of a restraining order. As we explain, we reject Ervin's other claims and

2

affirm the trial court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  2011 Restraining Order

In 2011, Ervin was married to Michal Ben-Nun.  According to Ben-Nun, in August 2011, Ervin threatened her and their three children by stating:  "One day I will take a gun and shoot all four of you."  Ben-Nun called the police, Ervin was removed from the family home and Ben-Nun obtained two temporary DVPA orders preventing Ervin from coming near her or their home.  Ervin and Ben-Nun's marriage was eventually dissolved.

Ervin has consistently denied threatening Ben-Nun or his children.  However, in civil litigation he pursued against Ben-Nun based on her repetition of the alleged threat to others, Ervin conceded he made an "unfortunate and irresponsible statement" to Ben-Nun.  (*Ervin v. Ben-Nun* (Aug. 29, 2014, D064236) [nonpub. opn.].)[2]

---

[2]    In the course of resolving disputed custody issues in the Ervin dissolution case, a trial judge heard testimony from Altafulla, which was largely favorable to Ervin.

In declining to order supervised visitation, the trial court in the dissolution action made the following statement:  "I do think that the FCS counselor's view of the incident and whether the -- what she characterized as a death threat was heard by all children, I think that was, for the reasons I've stated, very significant to her recommendation.  [¶] And I found that that didn't happen; that it was not a death threat and it wasn't heard by all the children.  It was a comment that was of extreme concern to them.  Understandably so.  Whether he intended it as a threat or not or whether all of them heard it at the time it was made or not.

"But I think on balance, even though there have been actions of Mr. Ervin that would be maybe different than I would advise, I don't think that they are of the type that I was concerned about in having supervised visitation."

Because Altafulla's testimony in the custody dispute and the trial court's remarks were not presented to the trial court in these proceedings, and, in any event, because they are consistent with the evidence of Ervin's lack of judgment presented here, we deny

3

B.  Relationship With Altafulla

Shortly after his separation from Ben-Nun, Ervin began a romantic relationship with Altafulla.  Eventually, Ervin and Altafulla purchased a home together, where they lived with two of Altafulla's daughters, aged nine and 17.

In February 2014, Ervin received a surveillance report, of unknown origin, which provided photographic and narrative evidence that Altafulla had been engaged in a romantic affair with what the record suggests was someone associated with a client of her employer.  In the trial court, Altafulla tacitly acknowledged that the affair took place.

Ervin did not respond well to the information disclosed in the surveillance report.  Ervin attributed the report to Ben-Nun, who he asserted hired the investigators to follow him; Ervin stated he believed that during the course of following him, the investigators discovered Altafulla's affair.  Notwithstanding his contention the investigation was originated by Ben-Nun, Ervin created a digital image of the report, including photographs of Altafulla and the man she was having an affair with, and emailed the report to a number of Ervin and Altafulla's mutual friends, relatives, and coworkers.  Ervin's email stated:  "I am deeply hurt, so take this with a grain of salt.  But I invested my life savings, and countless hours with this women's [*sic*] children to try to make it work.  Imagine you are taking care of another person's children -- not your own children, but another person's children -- only to find out the parent is not travelling for work, as they say, but cheating on you -- during the very time you are investing your life savings in a common house.

Ervin's request for judicial notice of them.  (See *Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1194; Evid. Code, § 459, subd. (a).)

4

[¶] I'm not asking for sympathy, but here I am stuck, with this woman who cheated on me. I invite you to have read [*sic*] of this report. [¶] Please let me know if you have any ideas how to overcome this."

Although immediately following disclosure of the affair both Altafulla and Ervin remained in the home, Altafulla attempted to avoid contact with Ervin. However, on the evening of February 25, 2014, Ervin would not let Altafulla into the master bedroom to retrieve her pajamas and she called police; the police arrived, and, after speaking with Ervin, Altafulla was able to retrieve belongings from her bedroom. After the police left, Ervin began angrily disassembling the two children's bedroom furniture and insisting that different sleeping arrangements in the home were necessary.

According to Altafulla, while Ervin was disassembling the children's furniture, Ervin disclosed to the children that their mother had been having an affair with another man, explained "blow jobs" to the girls, and warned them that their mother might have a sexually transmitted disease that they could contract if they shared towels with her.

Altafulla's 17-year-old daughter was severely traumatized by Ervin's behavior and fled the home in her car. Altafulla learned that her daughter had gone to a psychiatric facility and had been admitted. The following day, a psychologist at the facility contacted Altafulla and told her that her daughter was afraid of Ervin and that the facility would not release her daughter to Altafulla until Ervin left their home.

C. 2014 Restraining Order

On February 27, 2014, Altafulla obtained a temporary restraining order requiring

5

that Ervin leave the home and preventing him from having any contact with Altafulla or her children. On March 17, 2014, the trial court conducted a hearing on Altafulla's application for a permanent DVPA order against Ervin and Ervin's application for a restraining order against Altafulla.

The trial court granted Altafulla's application and denied Ervin's application. In granting Altafulla's application, the trial court stated: "The court has had the opportunity to review the pleadings in the file and observe the witnesses on the witness stand. The court is satisfied that Ms. Altafulla is legitimately in fear of ongoing harassing behavior from Mr. Ervin. Based upon the testimony that I have heard today and observing the demeanor and content of that testimony, as well as the pleadings, she is afraid for herself and on behalf of her children. An order will be issued for a period of five years protecting her."

In particular, the trial court ordered that Ervin leave the home he shared with Altafulla and stay away from it.

With respect to Ervin's application and the trial court's decision to deny it, the trial court stated: "Mr. Ervin testified he did not believe that Ms. Altafulla was violent. The activity that Mr. Ervin is complaining of -- while it is personally upsetting to him and I can understand why it is personally upsetting, it is not harassing, it does not come within the purview of the granting of a restraining order. His request is denied."

Ervin filed a second request for a DVPA restraining order, which the trial court also denied.

6

Ervin filed a timely notice of appeal from the trial court's orders.

DISCUSSION

I

Initially, Ervin argues Altafulla failed to properly serve him with her petition for a restraining order. We reject this argument because the proof of service shows that in fact Ervin was served with Altafulla's application; Ervin did file an opposition to the application, as well as his own application for a restraining order against Altafulla; Ervin did appear at the hearing on Altafulla's application; and the trial court did offer to continue the hearing if Ervin did not believe he received adequate notice. In short, the record shows that there was no defect in service and that, in any event, Ervin waived any such defect.

In particular, the proof of service in the record states that the sheriff's office received, among other documents, a "DV-100 Request for Domestic Violence Restraining Order." That form sets forth the grounds for Altafulla's application for a restraining order. The proof of service further states that the process the sheriff received was served on Ervin on March 2, 2014. Notwithstanding Ervin's arguments to the contrary, the proof of service was sufficient as prima facie proof that he was timely served with Altafulla's application for a restraining order. (Evid. Code, § 664 [presumption that official duty has been regularly performed].)

In any event, on the record at the hearing on Altafulla's application, Ervin waived any defect in service. At the commencement of the hearing, the trial court offered to

7

provide Ervin with copy of Altafulla's application and continue the hearing, and Ervin responded: "I would rather proceed." It is axiomatic that defects in service may be waived by a responding party either expressly or by appearing in an action and contesting the merits of the claims asserted. (See *Bank of America Nat'l Trust & Sav. Asso. v. Carr* (1956) 138 Cal.App.2d 727, 735.)

## II

Next, Ervin asserts that because Altafulla has never disputed the affair occurred and admitted to him that, following one of her trips with her lover, she experienced a yeast infection, his emails and statements to her children were literally true. Given the factual accuracy of his statements, Ervin contends they were not abusive and could not be the basis for a restraining order. He also argues that the trial court could not rely on the statements he made to Ben-Nun, which he contends were not death threats. We reject Ervin's arguments. The factual accuracy of information used to otherwise harass the victims of domestic violence does not take abusive conduct outside the scope of the DVPA. Moreover, Ervin's earlier statements to Ben-Nur and their children, even if they were not meant by him as actual death threats, demonstrate an appalling lack of judgment on his part, as even he acknowledged. Thus, they were relevant in determining whether Altafulla needed protection from Ervin.

The DVPA was enacted to protect domestic partners from abusive conduct, which, as the record here amply demonstrates, may involve the use of arguably accurate information in a manner that causes severe emotional distress. In this regard, the holding

8

and reasoning in *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495-1499 (*Nadkarni*) are persuasive and controlling. In *Nadkarni*, the DVPA applicant's former husband had gained unauthorized access to her email account and had both sent information gathered from the account to others and relied on information obtained from the account in the parties' ongoing child custody dispute. After she discovered her former husband's intrusion, the victim applied for a DVPA restraining order preventing him from further intrusion into the account, further distribution of information he found in the account, and delivery to her counsel of all information he had downloaded from the account. The trial court dismissed the victim's application on the grounds that the former husband's conduct was not subject to the DVPA. In reversing the dismissal, the Court of Appeal noted that "section 6320 broadly provides that 'disturbing the peace of the other party' constitutes abuse for purposes of the DVPA." (*Nadkarni*, at p. 1497.) The court then went on to broadly interpret the phrase as including the mental peace of DVPA applicants: "To determine the plain meaning of statutory language, we may resort to the dictionary. 'When attempting to ascertain the ordinary, usual meaning of a word [in a statute], courts appropriately refer to the dictionary definition of that word.' [Citation.] The ordinary meaning of 'disturb' is '[t]o agitate and destroy (quiet, peace, rest); to break up the quiet, tranquility, or rest (of a person, a country, etc.); to stir up, trouble, disquiet.' [Citation.] 'Peace,' as a condition of the individual, is ordinarily defined as 'freedom from anxiety, disturbance (emotional, mental or spiritual), or inner conflict; calm, tranquillity.' [Citation.] Thus, the plain meaning of the phrase 'disturbing the peace of the other party'

9

in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party.

"Our interpretation of the phrase 'disturbing the peace of the other party' in section 6320 also comports with the legislative history of the DVPA. As enacted in 1993 (Stats. 1993, ch. 219, § 154, p. 1654), the DVPA collected earlier provisions for the issuance of domestic violence restraining orders from the former Family Law Act (Civ. Code, former § 4359), the former Domestic Violence Prevention Act (Code Civ. Proc., former § 540 et seq.) and the Uniform Parentage Act (Civ. Code, former § 7020). [Citation.] These provisions all expressly authorized a domestic violence restraining order that enjoined 'disturbing the peace' of the other party. [Citations.]

"The 1979 Domestic Violence Prevention Act (Code Civ. Proc., former § 540 et seq.), like the current DVPA (Fam. Code, § 6200), had a 'protective purpose' that was 'broad both in its stated intent and its breadth of persons protected.' [Citation.] The 1979 act was intended to 'provide more protective orders to a broader class of victims of domestic violence,' and 'specifically sets forth the orders which may be issued by the court. These orders will enable the court to provide greater relief to victims in more areas of need.' [Citation.] Thus, as originally enacted, the DVPA reflected the Legislature's goal of reducing domestic violence and its recognition that '[i]t is virtually impossible for a statute to anticipate every circumstance or need of the persons whom it may be intended to protect. Therefore, the courts must be entrusted with authority to issue necessary orders suited to individual circumstances, with adequate assurances that both sides of the

10

dispute will have an opportunity to be heard before the court.' [Citation.]

"Accordingly, we believe that the Legislature intended that the DVPA be broadly construed in order to accomplish the purpose of the DVPA. Therefore, the plain meaning of the phrase 'disturbing the peace' in section 6320 may include, as abuse within the meaning of the DVPA, a former husband's alleged conduct in destroying the mental or emotional calm of his former wife by accessing, reading and publicly disclosing her confidential emails." (*Nadkarni*, *supra*, 173 Cal.App.4th at pp. 1497-1498.)

Here, Ervin's distribution of information about Altafulla's affair, which she plainly did not want to share with her coworkers, relatives, and friends, did cause and no doubt was calculated to cause, Altafulla grave emotional distress. The statements Ervin made to Altafulla's children were similarly calculated to and did in fact cause significant emotional distress to both Altafulla, as well as her children. The outrageous statement Ervin had previously made to Ben-Nur, even if the trial court accepted his interpretation of it as not intended to be a serious death threat, displayed a serious lack of judgment and self-control. Taken together, this history of abusive and outrageous conduct was more than sufficient to support intervention by the trial court by way of an order keeping Ervin away from Altafulla and her children.

### III

Next, Ervin contends the trial court erred in making its order effective for a term of five years. He contends Altafulla only requested a three-year order. The record in fact shows that although in her application for a permanent order Altafulla asked for a three-

11

year order, at the hearing Altafulla asked for a five-year order. Given the impact of Ervin's conduct on Altafulla's daughter, the trial court did not abuse its discretion in restraining Ervin for the full five years permitted under the DVPA. (See § 6345, subd. (a).) Altafulla's earlier request for a three-year order did not prejudice her later request for a five-year order, especially in light of Ervin's ability to seek relief from the order if he can show that it is no longer necessary. (*Ibid*.)

IV

Ervin argues the DVPA is unconstitutional on a number of grounds. In his opposition to Altafulla's application, Ervin argued that the DVPA was unfair because it gives women who have an "inchoate fear" of men the ability to intrude on men's rights when a romantic relationship ends. In a footnote in his opposition to Altafulla's application, Ervin added: "This analysis leaves a multitude of arguments regarding the prima facie unconstitutionality of the DVPA on the side but reserves those for appeal. The preponderance of evidence standard and the automatic gun ban are unconstitutional as are the vagueness and targeting of speech inherent in Family Code section 6320. These arguments are mentioned here to preserve them on appeal."

Ervin's conduct here gave rise to far more than an incipient or inchoate fear of him. Because the emails Ervin sent in no way portray him in a positive light but nonetheless were plainly designed to embarrass Altafulla, they were an unmistakable manifestation of his extreme anger towards her; Ervin's emotional abuse of Altafulla's two daughters was even more worrisome. In light of these circumstances, Altafulla's

12

fears were well developed and reasonable, and, in addressing the very real fears of such victims of harassment, the Legislature acted rationally.

Although we question whether Ervin's footnote preserved his right to raise his First and Second Amendment challenges to the DVPA on appeal (see *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947; see also *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 624), the DVPA's intrusion on free speech and Second Amendment rights withstand Ervin's facial challenge. "A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity." (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134.) Statutes that purportedly "'restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.' [Citation.] The 'protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives,' is such a compelling interest. [Citation.]" (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1381.)

With respect to Ervin's Second Amendment claims, although in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*) the United States Supreme Court struck down the District of Columbia handguns ban, *Heller* recognized and affirmed certain traditional limitations on the right to bear arms and "identified an expressly nonexclusive

13

list of 'presumptively lawful regulatory measures,' stating 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' [Citations]." (*People v. Delacy* (2011) 192 Cal.App.4th 1481, 1487–1488 (*Delacy*) [upholding constitutionality of Penal Code § 12021, subd. (c)(1), which prohibits possession of firearms by persons convicted of specified misdemeanors].)

Section 6389 is analogous to a prohibition on felon weapon possession, a type of restriction expressly listed by *Heller* as untouched by its holding. (See *Delacy*, *supra*, 192 Cal.App.4th at p. 1489; *United States v. Luedtke* (E.D.Wis. 2008) 589 F.Supp.2d 1018, 1021 [18 U.S.C. § 922(g)(8), which criminalizes possession of firearms and ammunition by persons subject to a domestic violence injunction, is a regulation of the type "that pass[es] constitutional muster" as "traditionally permitted in this nation"].) Indeed, courts have found that "[r]educing domestic violence is a compelling government interest [citation], and [a] temporary prohibition, while the [restraining] order is outstanding, is narrowly tailored to that compelling interest. [Citations.]" (*United States v. Knight* (D.Me. 2008) 574 F.Supp.2d 224, 226, fn. omitted [discussing constitutionality of 18 U.S.C. § 922(g)(8)].) "[A]nger management issues . . . may arise in domestic settings," and a firearm restriction in such cases "is thus a temporary burden during a period when the subject of the order is adjudged to pose a particular risk of further abuse.

14

[Citations.]" (*United States v. Mahin* (4th Cir. 2012) 668 F.3d 119, 125 [discussing constitutionality of 18 U.S.C. § 922(g)(8)].) In sum, we reject Ervin's constitutional claims.

V

Ervin also argues that the trial court abused its discretion in failing to grant his application for a restraining order against Altafulla. We find no abuse of discretion. There is no evidence in the record that suggests Altafulla engaged in any abusive or harassing conduct directed toward Ervin or was likely to do so. Her affair, the fact she developed a yeast infection and her own application for a restraining order are not abusive or harassing conduct circumstances within the meaning of the DVPA. Thus, there is nothing in the record that would support such an order.

VI

Finally, we reject Altafulla's request that we impose sanctions on Ervin. Although we have rejected Ervin's arguments on appeal, they are not so lacking merit that no reasonable attorney would assert them. (See *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650.)

15

DISPOSITION

The trial court's orders are affirmed.  Altafulla to recover her costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.

Filed 7/7/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CAROLINA ALTAFULLA, | D065980 |
| Plaintiff and Respondent, | (Super. Ct. No. DV038735) |
| v. | ORDER MODIFYING OPINION |
| JOHN ERVIN, | AND CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 9, 2015, be modified as follows:

1. On page 3, footnote 2, delete the second and third paragraphs and insert the following:

> The trial court made remarks, which were not unduly critical of Ervin's conduct.

2. On page 4, insert a paragraph break following the second full sentence of the third paragraph.

3. On page 9, insert a paragraph break following the sentence at line two, which ends with "are persuasive and controlling."

1

The opinion in the above-entitled matter filed on June 9, 2015, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered, as modified.

**There is no change in the judgment.**

NARES, Acting P. J.

Copies to:  All parties

2