Filed 9/8/23  A.Q. v. M.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| A.Q., | C095090 |
| Plaintiff and Respondent, | (Super. Ct. No. 21DV02189) |
| v. | |
| M.C., | |
| Defendant and Appellant. | |

This appeal arises out of a trial court order granting plaintiff and respondent A.Q. a domestic violence restraining order (DVRO), protecting him and his girlfriend from defendant and appellant M.C., his former girlfriend.  M.C. contends insufficient evidence supported the court's order, and that the order unconstitutionally restricted her free speech and was overbroad.  We agree with M.C. that insufficient evidence supported the DVRO, and therefore we reverse the trial court's order.

1

## FACTS AND PROCEEDINGS

*Request for DVRO*

A.Q. filed a request for DVRO on August 5, 2021, seeking protection for himself and his girlfriend, K.H., from M.C., a person A.Q. used to date. A.Q. sought personal conduct and stay-away orders against M.C. The request alleged that, on July 26, 2021, M.C. had posted on her Facebook account arguing that anyone reading the post should unfollow, unfriend, and cease contact with a third person. M.C. responded to those who commented on her post and stated that A.Q. "should be 'removed as a friend . . . unless you like men who smother their girlfriends with pillows and cover them in bruises.' " The request continued: "She proceeded to engage with and comment directly against [A.Q.] in multiple other comment threads to no less than 11 people directly," and it was not clear how many people saw these or were affected. The actions came about suddenly and were not based on any recent or new activity by A.Q. A.Q. suffered from Chronic Posttraumatic Stress Disorder (CPTSD), and he experienced immediate and significant emotional distress due to M.C.'s Facebook posts and subsequent communications with third parties questioning or accusing him of abuse and ending their association with him. The online posts were still live and being commented on by others.

A.Q.'s request further alleged that M.C.'s most recent Facebook posts were just "one of many instances since [A.Q.] and [M.C.'s] separation [in 2018] where she has harassed online or via text message or online messenger and inaccurately accused him of abuse and/or slandered his name and character without substantiated evidence."

The trial court denied a temporary restraining order until the court hearing, scheduled for August 30, 2021. The court concluded that the facts stated in A.Q.'s request did not show reasonable proof of a past act or acts of abuse and did not describe in sufficient detail the most recent incidents of abuse.

M.C. filed an opposition to A.Q.'s request. She asserted that the case arose from a post on M.C.'s Facebook account describing her prior "toxic relationship with a third

2

party." M.C. had blocked A.Q. from viewing her Facebook posts, but a mutual acquaintance shared the post with him. This caused A.Q. to "post inaccurate information regarding our past relationship," which M.C. ended in 2018 out of fear for her safety. During their breakup in 2018, A.Q. had held a pillow over her face, grabbed her hard enough to leave bruises on her arms, and caused property damage. M.C. included photographs of bruises on her right arm, a photograph of damage to a closet door, and a statement from her brother. In the statement, M.C.'s brother described a phone call between A.Q. and M.C. that he overheard shortly after their breakup in which A.Q. pleaded with M.C. "not to tell anyone he was an abuser" and that "he would not be able to live with himself if she told anyone about [A.Q.] being abusive." The call had caused M.C. to become tense, stressed, and overwhelmed.

M.C. further stated in opposition that she moved to Southern California in 2019 to stay with her parents because she did not want to risk encountering A.Q. She only recently had the courage to speak to others about the abuse from A.Q. during their relationship. She did not share her story immediately after the events because she did not feel safe, and she did not file a police report because she was, "at the time, sympathetic to [A.Q.'s] mental health issues."

M.C. disputed the need for any protection to either A.Q. or K.H. because she posed no threat to them, "physical or otherwise," and did not expect to have any future contact with either A.Q. or K.H. because she lived 400 miles away from them.

*A.Q.'s Testimony*

A.Q. and M.C. testified at the hearing on the request for DVRO, held on August 30, 2021. A.Q. testified that he had attempted to file 96 pages of evidence with the trial court several days prior and had served M.C. with that evidence, but it was not

3

processed in time for the hearing.[1]  A.Q. agreed to proceed with the hearing, relying on his petition and testimony.  He was under significant mental and emotional duress and felt it was impossible to delay the proceedings further or it would continue to compound his lack of emotional and mental calm.  He was very emotional and had to stop and take short breaks at several points during his testimony to maintain his composure.

A.Q. explained that he suffered from CPTSD due to childhood trauma and had been treated previously for severe depression and suicidal ideation associated with his CPTSD.  He had also suffered traumatic levels of isolation when he came out as a transgender man in 2015, which further compounded his CPTSD.

A.Q. acknowledged that he and M.C. had "an intense argument" at the time of their breakup in 2018, but he denied that he had engaged in any abusive behavior.  After their breakup, M.C. harassed him via text messages for several weeks; he responded only to tell her to stop contacting him.[2]  In the three years following the breakup, A.Q. continued to receive sporadic and unpredictable loss of professional relationships and personal contacts due to direct disruption by M.C.  M.C. had harassed A.Q. repeatedly by seeking out and directly communicating–publicly and privately–with multiple people connected to A.Q. in an attempt to remove their connection with him and damage his professional image.  M.C. had publicly, through social media, and privately (including in-person, phone, and text) accused A.Q. of being physically violent during their breakup.  M.C.'s conduct had caused A.Q. to be evicted by his landlord and had resulted in significant damage to his personal and professional relationships.

---

[1]  These facts are taken primarily from the trial court's settled statement of the evidentiary hearing for the DVRO.

[2]  The record does not reflect that A.Q. testified about the nature of this alleged harassment, although his request for DVRO alleged that M.C. had harassed him since their 2018 breakup by "inaccurately accus[ing] him of abuse and/or slander[ing] his name and character without substantiated evidence."

Before the COVID-19 pandemic shutdown, A.Q. had been working in the performing arts, which represented nearly 20 percent of his income at the time. M.C. was aware of the nature of A.Q.'s work and knowingly caused a significant disruption to his mental and emotional peace, with the intention of negatively impacting his career and social standing in the Sacramento arts community.

Several months after their breakup, M.C. relocated to Southern California to live closer to her family and attend school. Since M.C. had already damaged several of A.Q.'s most significant relationships, he was fearful and defeatist in attempting to denounce her claims. He took to social isolation, believing that if he spoke out, M.C. would cause further damage to his professional and social reputation.

The conduct that prompted A.Q. to file his request for DVRO began with a public Facebook post that M.C. initiated in July 2021. The initial post accused another of her ex-boyfriends of sexual assault. However, M.C. immediately, purposefully, and without provocation, began instigating new conversation threads on the post that were centered on A.Q.; these comments were public and were intended to cause A.Q. harm and disturb his emotional peace. M.C. initiated 11 identical comment threads on the original post, each of which contained the same message but tagged a different mutual professional contact within the Sacramento theater community. A.Q. quoted the post directly from M.C.'s public Facebook account: "It has come to my attention that people don't know that [A.Q.] should also be removed from your friends list. Unless you like men who smother their girlfriends with pillows and leave them covered with bruises."

A.Q. was alerted to the posts by a colleague, who was tagged by M.C. in one of her comments. This colleague contacted A.Q. via a private online message and told him that she was ending their 10-year friendship due to M.C.'s allegations. Although M.C. had blocked A.Q. and K.H. from viewing her Facebook account, her post and comments were public and could be accessed by a routine Google search. All of the posts were viewable by A.Q., his friends, his colleagues, and the general public.

5

After seeing the number of professional colleagues who had interacted with the posts, A.Q. descended into a CPTSD attack and required a week off from work to recuperate. A.Q. sought a DVRO because M.C. had been persistently harassing him through these accusations and would continue to do so through online interactions with his friends and professional colleagues. A.Q. feared for his life because of the increased CPTSD symptoms, depression, and anxiety, which would continue until M.C.'s actions ceased.

All of M.C.'s claims had changed; she initially claimed that A.Q. caused one bruise, but her Facebook post said that he had " 'covered her in bruises' and 'attempted to smother her.' " He reiterated that all her claims were false, and she showed no signs of ceasing the actions that were causing him significant disturbance.

*M.C.'s Testimony*

M.C. testified that she had little to add to what she stated in her opposition to A.Q.'s petition for DVRO. She and A.Q. broke up over two years earlier. The breakup was difficult, and he had become physically violent with her. A.Q. held a pillow over her face, grabbed her so hard that he left bruises, and broke a closet door.[3] She did not report these incidents to the police because A.Q. called her shortly after their breakup and threatened his own life, and she was sympathetic to his mental health issues.[4]

M.C. was now living in Los Angeles County and did not pose a threat to A.Q. or K.H. because she lived so far away. M.C. had blocked A.Q. from her social media since the breakup and did not know how A.Q. saw the Facebook post; she assumed it was

---

[3] M.C. referred the trial court to the photograph of her bruised arm and the damaged closet door, although she acknowledged that the photographs did not include time or date stamps.

[4] M.C. referred the trial court to her brother's statement that she had included in her opposition to A.Q.'s request for DVRO; her brother wrote the statement recently at M.C.'s request and was based on her brother's memory of the incident.

shared with him by another person. The post and comments were still visible on her Facebook page at the time of trial, and she had no intention of taking them down. The post and comments were public, but they could not be seen by blocked profiles. M.C. felt empowered to tell people about A.Q.'s abuse.

At the outset of M.C.'s testimony, she contested A.Q.'s claim that her story had changed over time. She asserted that she had never claimed A.Q. had caused multiple bruises, only one. At the end of her testimony and in response to the trial court's request for clarification, M.C. reiterated that she never posted about multiple bruises, but rather that she posted about him giving her a bruise. When asked by the trial court to clarify exactly what she had posted, M.C. read the following: "It has come to my attention that people don't know that [A.Q.] should also be removed from your friends list. Unless you like men who smother their girlfriends with pillows and leave them covered in bruises."

M.C. was informed in a private online message by a head director that a theater had banned A.Q. due to inappropriate conversations with fellow actors. A.Q. responded that was the first time he had heard that.

*A.Q.'s Rebuttal Testimony*

In response to M.C.'s testimony, A.Q. stated that the conversation from M.C.'s brother's statement occurred after M.C. had caused him to be evicted and had begun publicly accusing him of abuse. He had called M.C. emotionally distraught and fearing for his life and begged her to stop lying about what happened. A.Q. denied causing the bruise in the photograph M.C. offered as evidence, that he had caused any property damages (noting that neither M.C. nor his landlord attempted to collect on or report him for property damages), and that he had engaged in any inappropriate behavior with any actors from theaters as M.C. claimed. A.Q. was a respected member of the theater community for 10 years and was never accused of any impropriety.

On August 30, 2021, the trial court found there was sufficient evidence to grant a DVRO under the Domestic Violence Prevention Act (DVPA) (Fam. Code § 6200 et

7

seq.)[5], and issued a DVRO protecting A.Q. and K.H. from M.C. for a period of three years.  M.C. timely filed a notice of appeal.  The case was fully briefed in June 2023 and was assigned to the current panel on June 30, 2023.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

M.C. claims the trial court abused its discretion by issuing a DVRO based on conduct insufficient to violate the DVPA.  As we will explain, we agree.

A.  *Standard of Review*

"A trial court has broad discretion under the DVPA to determine whether to grant a petition for a restraining order."  (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143.)  "We review an order granting a DVRO for abuse of discretion.  [Citation.]  In reviewing the trial court's factual findings, we apply the substantial evidence rule.  [Citation.]  The inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made.  [Citation.]  We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment."  (*Id.* at pp. 1143-1144.)  Where, as here, neither party requested a statement of decision or statement of reasons, we infer all factual findings necessary to support the order on appeal, uphold those factual findings if they are supported by substantial evidence, and then review the court's conclusion based on those implied factual findings for abuse of discretion.  (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1148.)

" 'However, the question of "whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de

---

[5]  Further undesignated statutory references are to the Family Code.

novo review." [Citation.]' [Citation.] The trial court's order 'is presumed to be correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent. [Citation.] It is the appellant's burden to affirmatively demonstrate error. [Citations.]' " (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509.)

M.C. contends that de novo review is required because the trial court applied the incorrect legal standard. However, she does not argue in the opening brief how the court applied the wrong legal standard. She provides no citations to any legal mistakes by the court. The court was well aware that A.Q. sought the DVRO based on M.C.'s disturbing his peace, and the court found the evidence was sufficient to support the DVRO. To the extent M.C. argues that the court's implied factual findings were insufficient to support the DRVO, we will uphold the court's implied factual findings if they are supported by substantial evidence and review the court's conclusion for abuse of discretion, which we will find if the evidence was legally insufficient to support the order.

B. *The DVPA*

" 'Under the DVPA, the trial court may issue an order "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." ' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782, quoting § 6300.) "The DVPA 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally.' " (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11 (*Curcio*).)

The DVPA's definition of abuse includes, *inter alia*, "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320" (§ 6203, subd. (a)(4)) and specifies that the definition of abuse "is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)). Courts may issue a DVRO pursuant to section 6320 for behavior including "stalking, threatening . . . , *harassing*, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the

9

Penal Code, . . . *contacting, either directly or indirectly, by mail or otherwise,* coming within a specified distance of, or *disturbing the peace of the other party*, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a), italics added.)

Former section 6320 did not define the phrase " 'disturbing the peace of the other party,' " and courts construed it to mean "conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*); *McCord v. Smith* (2020) 51 Cal.App.5th 358, 364-365 [citing *Nadkarni*].) "The *Nadkarni* court's definition has been applied consistently since 2009." (*People v. Sorden* (2021) 65 Cal.App.5th 582, 601.)

Effective January 1, 2021, section 6320 was amended by Senate Bill No. 1141 (2019-2020 Reg. Sess.) (Senate Bill No. 1141), which sought in part "to better protect victims of domestic violence by . . . codifying language from [*Nadkarni*] on destroying the other party's mental or emotional calm." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1141 (2019-2020 Reg. Sess.) as amended Aug. 6, 2020, p. 1.)[6]

As amended by Senate Bill No. 1141, current subdivision (c) of section 6320 provides in relevant part: "As used in [§ 6320] subdivision (a), 'disturbing the peace of the other party' refers to conduct that, based on the totality of circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including using a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not

---

[6] We grant A.Q.'s motion for judicial notice of certain legislative materials and take judicial notice on our own motion of other relevant legislative materials referenced herein. (*In re J.W.* (2002) 29 Cal.4th 200, 211 [court may take judicial notice of legislative history].)

10

limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty. Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following: [¶] (1) Isolating the other party from friends, relatives, or other sources of support. [¶] (2) Depriving the other party of basic necessities. [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services."[7]

M.C. contends that the Legislature, in passing Senate Bill No. 1141, also "establish[ed] narrow parameters to limit the application of its provisions to clearly abusive behaviors" by setting forth parameters including "a mental state, *objective unreasonableness*, causation, foreseeable harm, actual harm" in order to "provide *strong guardrails* to help ensure that the bill will function as intended and not reach benign conduct that is ordinarily tolerated in relationships or that does not actually distress the person." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1141 (2019-2020 Reg. Sess.), as amended May 6, 2020, p. 7.) As amended in the Senate on May 6, 2020, the bill provided in part that "[a] person's conduct constitutes coercive control if the person intentionally, or with reckless disregard of the consequences, engages in a pattern of behavior that interferes with the will of the victim with the intent to cause the victim severe emotional distress or that a reasonable person would know would be likely to cause the victim severe emotional distress, the victim does suffer severe emotional distress, and the person's conduct is not reasonable under the circumstances." (Sen. Bill No. 1141 (2019-2020 Reg. Sess.), as amended May 6, 2020, § 4, p. 6.)

However, this language does not appear in the final version of the bill. (See § 6320, as amended by Senate Bill No. 1141 (2019-2020 Reg. Sess.).) Further, the

---

[7] Section 6320, subdivision (c) was subsequently amended again by Senate Bill No. 374 (2021-2022 Reg. Sess.), but those amendments are not relevant here.

Senate Floor Bill Analyses rejected what could have been construed as narrowing protections afforded to domestic violence victims: "As it left the Senate, this bill was slightly narrower, prompting some stakeholders who supported this bill's aims to argue that it could perversely result in a narrowing of the law. The *McCord* case, [*McCord v. Smith, supra*, 51 Cal.App.5th 358], decided in June, reaffirmed the broad approach courts have adopted in determining whether a person's actions disturb the peace of the victim. The author, stakeholders, and Assembly Judiciary Committee worked closely to resolve all significant concerns surrounding the bill by effectively codifying this line of cases and providing courts additional guidance on the types of circumstances that amount to coercive control or otherwise destroy a person's mental or emotional calm. This elegant solution removed all opposition." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis on Sen. Bill No. 1141 (2019-2020 Reg. Sess.), as amended Aug. 6, 2020, pp. 6-7, fn. omitted.) That bill analysis reiterated that "the Legislature is making clear that judges should broadly recognize instances of disturbing the peace of others as what it is—domestic violence that can be prevented through the issuance of a protective order." (*Id.* at p. 6.) The analysis further noted that the bill "sets forth a non-exhaustive list of examples of coercive control that should help courts recognize coercive control when hearing these cases and in no way limit what a court may consider coercive control to just these instances." (*Ibid.*)

    C. *Sufficiency of the Evidence Supporting the DVRO*

        i. Factual Findings

We first briefly summarize the facts found by the trial court to support the DVRO. A.Q. testified (in August 2021) that, in the weeks after his 2018 breakup with M.C., she harassed him via text messages. The record does not reflect the nature of those harassing text messages, although A.Q.'s request for DVRO stated that M.C. had previously harassed him via text message or online messenger by accusing him of abusing her. In the three years before the July 2021 social media posts that prompted A.Q. to request a

12

DVRO, M.C. had told multiple contacts of A.Q. that he had abused her, in an attempt to effectuate these contacts' severance of their connections to A.Q. and to damage his professional image.

A.Q. requested a DVRO the month after M.C. posted 11 identical public comments to a Facebook post, each of which included the same text but tagged a different one of A.Q.'s professional contacts in the Sacramento theater community. A.Q. was alerted to the comments by a colleague who contacted him to tell him that she was ending their professional relationship. The post and comments were able to be viewed by the public through a Google search, including by A.Q., although M.C. had blocked his Facebook account from viewing hers. After seeing that a number of his professional colleagues had interacted with the posts, A.Q. descended into a CPTSD attack from which it took him a week to recover. M.C.'s posts were live at the time of trial, and she had no intention of taking them down. A.Q. testified that M.C.'s conduct caused him to be evicted by his landlord, to lose professional contacts, and to become socially isolated.

ii. Analysis

Primarily relying on *Curcio, supra*, 47 Cal.App.5th 1, M.C. contends the evidence was insufficient to support a DVRO.[8] *Curcio* involved two romantic partners, one of whom–the petitioner, Curcio–had secured a DVRO based on the other partner's (Pels's) single, private social media post about Curcio. On appeal, the court recognized that conduct involving social media *can* constitute abuse under the DVPA for disturbing the petitioner's peace, but it agreed with Pels that "her private Facebook post does not constitute disturbing the peace under the DVPA." (*Id.* at pp. 11, 12-13.)

---

[8] M.C. contends *Curcio* "should control here." We note that "[w]e, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But '[w]e respect stare decisis, however, which serves the important goals of stability in the law and predictability of decision.' " (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529.)

13

In determining that Pels's conduct was not sufficient to disturb Curcio's peace as required to obtain a DVRO, the *Curcio* court distinguished the facts there from those in *Nadkarni, supra*, 173 Cal.App.4th 1483, and *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1419. In *Nadkarni*, the petitioner alleged that her ex-husband had accessed, read, and disseminated the contents of her confidential emails, which caused her to suffer embarrassment and "to fear for her safety." (*Nadkarni,* at pp. 1497-1499.) In *In re Marriage of Evilsizor & Sweeney*, a husband downloaded tens of thousands of the petitioner's text messages and information from the "notes" application on her cell phone (which she used as a diary), transmitted her text messages to third parties, threatened to reveal more text messages and emails, and hacked her Facebook account, changed her password, and rerouted emails from her Facebook account to his own email account. (*In re Marriage of Evilsizor & Sweeney,* at p. 1419.)

The *Curcio* court observed that "Pels's single, *private* Facebook post accusing Curcio of abusing her is a far cry from the conduct described [in *Nadkarni* and *In re Marriage of Evilsizor & Sweeney*]." (*Curcio, supra*, 47 Cal.App.5th at p. 13.) The court reiterated that "Pels expressed political views and posted her opinion of Curcio to her own *private* social media account," and Curcio testified that the post " 'was not public.' " (*Id.* at p. 13.) Curcio did not present any evidence that Pels sent her harassing, threatening, or unwanted texts, emails, or social media posts. (*Ibid.*) Nor did Pels publish or distribute to third parties Curcio's private information or messages. (*Ibid.*) The court recognized that Curcio "understandably was upset by the social media post and it may have made her fear for her career," but it concluded that did not rise to the level of "destruction of Curcio's mental and emotional calm, sufficient to support the issuance of a domestic violence restraining order." (*Ibid.*)

M.C. acknowledges that, unlike the social media post at issue in *Curcio*, her social media posts about A.Q. were public. However, she contends the Facebook account's privacy setting "is not dealt with as a factor determinative in the *Curcio* court's analysis,"

14

and, like A.Q., Curcio learned about the post after being contacted by a colleague. She argues that the "correct focus" of our inquiry should be whether M.C. published or distributed A.Q.'s private information or messages to third parties.

We agree with M.C. that while her social media post and comments here were public, they shared key relevant characteristics with Pels's post in *Curcio*. First, neither the post here nor that in *Curcio* was directed at the party seeking the DVRO. In *Curcio*, Pels's post was posted to her private account, unlike M.C.'s public post here. However, M.C. had blocked A.Q. from viewing her profile, where the post was contained. In other words, not only was the post *not sent* to A.Q., but he was also blocked from viewing it, at least in its original location, where it had been placed by M.C. Thus, in both this case and *Curcio*, the person who was the subject of the post was informed about the post by a third party and was not intended to see or receive the post directly from its creator. Additionally, in both cases, the person who was the subject of the post feared that the post would negatively affect their professional reputations because the post was accessible by their professional colleagues. Thus, while the public nature of M.C.'s post could have caused her post to have a wider reach, both M.C.'s post and Pels's post in *Curcio* had the primary negative effect of causing the subject of the post to fear the post's effect on their careers.

We recognize that A.Q. raised additional allegations against M.C. that were not present in *Curcio*. A.Q. testified that M.C. reached out to his professional contacts and his landlord to inform them that A.Q. had abused her, and M.C. had accused him of abusing her in the weeks following their breakup three years prior to the post at issue.

However, we conclude that these differences are not dispositive and, as in *Curcio*, M.C.'s conduct fell short of the conduct that has been held to violate the DVPA. As the *Curcio* court observed: "We do not interpret *Nadkarni* and its progeny to hold a restraining order may issue based on any act that upsets the petitioning party. The DVPA was not enacted to address all disputes between former couples, or to create an alternative

15

forum for resolution of every dispute between such individuals. If Pels's Facebook post is libelous, for example, Curcio may seek recourse through a defamation suit." (*Curcio, supra*, 47 Cal.App.5th at p. 13.) The same is true here. There is no evidence that M.C. sent A.Q. any recent harassing, threatening, or unwanted texts or e-mails. There also is no evidence that the allegedly harassing texts that M.C. sent to A.Q. in 2018 did anything other than accuse him of abusing her. "Nor is there evidence [M.C.] published or distributed to third parties [A.Q.'s] private information or messages, as was the case in both *Nadkarni* and *In re Marriage of Evilsizor & Sweeney*. [A.Q.] certainly never claimed the Facebook post included [his] confidential information." (*Id.* at p. 13.)

A.Q. contends this case is analogous to *Altafulla v. Ervin* (2015) 238 Cal.App.4th 571. In that case, the partner of the petitioner seeking a DVRO had obtained a surveillance report providing evidence that the petitioner had a romantic affair with another person. (*Id.* at p. 575.) The partner copied the report and emailed it to their mutual friends, relatives, and coworkers. (*Id.* at pp. 575-576.) In another incident, the partner refused to allow the petitioner into her bedroom to retrieve her belongings until after the police arrived and spoke with him. The partner also told the petitioner's 17-and nine-year-old daughters, "in fairly graphic terms," that their mother "had engaged in oral copulation with another man, and then warned the girls about what he believed was a risk they could contract sexually transmitted diseases from towels their mother might use." (*Id.* at pp. 574, 576.) In a further effort to traumatize the children, the partner began dismantling their bedroom furniture. (*Id.* at p. 574.) The petitioner's 17-year-old daughter was so traumatized she required inpatient care at a mental health facility. (*Id.* at pp. 574, 576.)

M.C.'s conduct falls well short of the partner's behavior in *Altafulla*. M.C. did not conduct an invasive surveillance operation on A.Q., nor did she repeatedly attempt to traumatize A.Q.'s children. M.C.'s conduct simply was not sufficient to warrant a DVRO, which, as *Curcio* recognized, is no small concern: "[A] domestic violence

16

restraining order is no ordinary injunction. Its violation is punishable as a misdemeanor. (Pen. Code, §§ 166, subd. (c)(3)(A); 273.6.) Arrest is mandatory where an officer has probable cause to believe the order has been violated. ([*Id.*], § 836, subd. (c)(1).) Moreover, '[t]here often will be some social stigma attached while a person is subject to a protective order. Existing employers may frown on an employee who is subject to such an order and prospective employers almost surely will. Thus[,] the restrained party may lose out on a promotion or a job.' " (*Curcio, supra*, 47 Cal.App.5th at p. 13, fn. 6.) We reiterate that A.Q. "may seek recourse through a defamation suit" if he believes M.C. has defamed him. (*Id.* at p. 13.)

We recognize that substantial evidence supports the finding that A.Q. was greatly affected by M.C.'s conduct and that M.C. was aware of his mental health issues. We agree with A.Q. that our consideration of whether his mental or emotional peace were disturbed under a totality of the circumstances review includes his subjective response to the conduct. As we have discussed, the legislative history of Senate Bill No. 1141 did not impose a standard of "objective unreasonableness," as M.C. contends. "What disturbs the peace of a person differs in each case" (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981), and it is "essential . . . that the court rigorously evaluate the evidence to ensure that the moving party has, in fact, been victimized" (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 205). In *Nadkarni, supra*, 173 Cal.App.4th at page 1499, in concluding that sufficient evidence supported the application for a DVRO, the court recognized that the husband's conduct caused the petitioner "to suffer 'shock' and 'embarrassment,' to fear the destruction of her 'business relationships,' and to fear for her safety." Similarly, in *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 822, the court recognized that the disturbance of the petitioner's mental calm continued "despite respondents' knowledge of the adverse consequences to [the petitioner's] health and pregnancy."

17

But although we uphold the trial court's implied factual finding A.Q. was, unfortunately, every bit as traumatized and damaged as he claimed to be, that is not dispositive of the question before us. The totality of the circumstances includes an analysis of whether M.C.'s *conduct itself* merits the issuance of a DVRO, which, as we have described, carries criminal penalties for its violation as well as other serious consequences. A petitioner's subjective response to the other party's conduct is not sufficient, on its own, to support a DVRO where the other party's conduct is legally insufficient to warrant one. (See *Curcio, supra*, 47 Cal.App.5th at p. 13 ["We do not interpret *Nadkarni* and its progeny to hold a restraining order may issue based on any act that upsets the petitioning party"].) Thus, based on the totality of the circumstances– including M.C.'s conduct, M.C.'s knowledge of A.Q.'s mental illness, and A.Q.'s reaction to M.C.'s conduct–we conclude that substantial evidence does not support the issuance of a DVRO.[9]

---

[9] Because we find M.C.'s conduct does not constitute abuse under the DVPA, we need not and do not address M.C.'s constitutional claims that the DVRO is a prior restraint on her speech and was overbroad.

## DISPOSITION

The August 30, 2021, order restraining M.C. is reversed.  The parties are to bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                         /s/                                      ,
                                       Duarte, Acting P. J.


We concur:


       /s/                                      ,
Krause, J.


       /s/                                      ,
Boulware Eurie, J.